**UNITED STATES of America ex rel.**
**Timothy CLEMMER**

**v.**

**Superintendent MAZURKIEWICZ.**

**Civ. A. No. 72–1039.**

United States District Court,
E. D. Pennsylvania.

April 30, 1973.

Harry S. Tischler, Defender Association of Philadelphia, Philadelphia, Pa., for plaintiff.

W. Robert Landis, West Chester, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, District Judge.

Relator, Timothy Clemmer, seeks a writ of habeas corpus. He was convicted in state court on charges of rape and burglary. After conviction, relator appealed to the Pennsylvania Superior and Supreme Courts without success, and relief under the state Post-Conviction Hearing Act was denied, without hearing, by the Court of Common Pleas and the Superior and Supreme Courts of the Commonwealth of Pennsylvania. This court directed that a hearing be held

and two such hearings were held. Briefs and supplemental briefs have been filed by relator and by the Commonwealth and the matter is now ripe for decision.

Relator makes two basic points, contending that (1) the pretrial identification procedures initiated by the State Police deprived him of his constitutional rights and (2) the actions and inactions of trial counsel deprived him of his right to effective assistance of counsel.

### I. *The Pretrial Identification Procedures.*

Relator argues that two distinct methods of identification used by the state police violated his rights: a photo spread and an impromptu lineup.

Several days after the rape, the victim, Mrs. Geraldine Talucci, was shown a photo spread consisting of eight or nine photos including petitioner's. Having picked out petitioner's picture as that of her assailant, she stated that she wished to see him "live" to make sure she had the correct man before making a definitive statement that he was indeed her attacker. Therefore, two days later, the victim was taken to West Chester State College, where relator was employed as a groundskeeper. The police had arranged for the crew with which relator worked to be assigned to an area outside an office where Mrs. Talucci stood watch with the police. At this time she positively identified relator as the rapist and he was taken into custody.

a. The photo spread. On October 2,[1] five days after the attack, the prosecutrix was shown eight or nine photos. All but one, relator's, were "mug shots" from the files of the state police. The officer who assembled the photos testified that he could not remember whether or not the "mug shots" used were of the type containing a number or other obvious identification indicating prior in-

---

1. This was the date given at the hearing. The original trial transcript however indicates that the date was October 3.

volvement with the law. (N.T. 72).[2, 3] Relator's picture was obtained from his employer. (N.T. 71). The photographs used were chosen purposefully to be "close to the description so that he wouldn't be the only young person in there." (N.T. 72f.). Mrs. Talucci testified that she was shown "eight or ten" photographs approximately and told "to look through them and see if I recognized anybody." (N.T. 233). The witness continued,

> The first time I shuffled through them as soon as I saw the picture I said, "That's him."

(*Id.*). She went on to say, "I am certain but I would like to see him . . . because I wouldn't want to pin that on somebody I wasn't definite about." (N.T. 234–35). During the conclusion of the direct testimony, the following questions were asked and answers given:

> Q. Now, I ask you to try to understand this question.
>
> Was your identification of Mr. Clemmer [at the trial] based upon your recollection of the pictures that had been shown to you or of your picking Mr. Clemmer out at the college lineup?
>
> Do you understand the question?
> A. It wasn't based on the pictures. I guess the answer to the actual question would be it was based on the college lineup, but actually it was based on the man who got into my car that night.
>
> Q. Let me ask you if you had not seen the pictures or if you had not gone to the college for a lineup—OK?
> A. Yes.
>
> Q. —and the same thing took place in court, would you have been able to identify Mr. Clemmer as your assailant?
>
> A. Yes.

(N.T. 243). Mrs. Talucci did not see the pictures after the photo spread, until the time of trial when she again saw the relator's photograph. (N.T. 247).

This area of the law has been extensively examined by the Third Circuit in recent cases. The circuit court had held that a photo spread, after arrest, was a "critical stage" in the proceedings and that the accused was entitled to the protection of counsel. United States v. Zeiler, 427 F.2d 1305 (3rd Cir. 1970) (*Zeiler* I.). Photo spreads were considered again in United States v. Zeiler, 447 F.2d 993 (3rd Cir. 1971) (*Zeiler* II), and the court held that in-court identifications were admissible only if the government established an origin independent of a photo spread outside the presence of counsel. In United States ex rel. Reed v. Anderson, 461 F.2d 739 (3rd Cir. 1972), the court specifically overruled the "critical stage" holding of *Zeiler* I; in any event, *Zeiler* I was to be applied prospectively only from June 5, 1970. United States v. Higgins, 458 F.2d 461, 464 (3rd Cir. 1972). If, however, the photo spread was inherently suggestive, the defendant must be protected against it. *See, e. g.*, Reed v. Anderson, *supra*, 461 F.2d at 745.

As the transcript sections quoted above indicate, there was nothing inherently suggestive about the photo spread. The criteria for determining "suggestiveness" were examined in *Zeiler* II, *supra*, 447 F.2d at 995:

> The following factors, previously mentioned by the Supreme Court in lineup cases, have an equally important bearing in this type of case upon the true basis of each witness' in-court identification: (1) the manner in which the pretrial identification was conducted; (2) the witness' prior opportunity to observe the alleged criminal act; (3) the existence of any discrepancies between the defendant's actual descrip-

---

**2.** All references to the hearing held in this court are indicated by (N.T.); references to the state trial transcript are indicated by (T.T.).

**3.** The prosecutrix testified that she did not notice any writing or markings on the pictures, but said there could have been. (N.T. 234).

tion and any description given by the witness before the photographic identification; (4) any previous identification by the witness of some other person; (5) any previous identification of the defendant himself; (6) failure to identify the defendant on a prior occasion; and (7) the lapse of time between the alleged act and the out-of-court identification. [citation omitted.]

The criteria will be examined in the context of the present case.

1. *Manner conducted.* Although relator sought unsuccessfully to show that the "mug shots" used were of the type containing an identification number, this cannot be taken as established from the testimony. Nonetheless, and even assuming that they did have such a number, Mrs. Talucci was quite positive in her testimony in stating that she noticed no such numbers or other markings. Moreover, only one picture of the relator was used; the other pictures were selected to generally fit Clemmer's description; no prompting or agreement on the choice made by the witness was evident. She picked out the defendant's photograph without any suggestive "assistance."

2. *Opportunity to observe.* The crimes charged were rape and burglary and the victim and the perpetrator were together for an extensive period of time, i. e., something in excess of a half an hour.

3. *Description discrepancies.* The description given in the police reports, obtained shortly after the incident from Mrs. Talucci, does not match the relator in every detail. Quite a bit was made of the "pock marks" which the reports indicated the assailant had, and which relator lacked. However, this was adequately explained by the complaining witness as a misunderstanding between herself and the reporting officer. (N.T.

241, 250f.) Mrs. Talucci described the appearance as "a rough complexion."

4. *Other persons.* The only indication at the hearing of anything of this nature was the incident at the Downingtown police station on the night of the rape. The Downingtown police had picked up a suspect who fit the approximate description given by the victim. The investigating officer, E. W. Donnon, related the following:

A. . . . We got back to the police station. I then sent Officer Sweeney up after Mrs. Talucci to come down and have a look at this man.

Q. Did she see [the suspect]?

A. Yes.

Q. What was her reaction?

A. She came in the rear door of the police station, she looked at the man as soon as she came in the door and froze solid for a second, and looked at me and said . . . "Eddie [the officer], that is not the man." (N.T. 10f.).

Clearly, this was not a misidentification.

5. *Prior identification.* There was none.

6. *Failure to identify.* Again, there was none.

7. *Lapse of time.* The rape occurred on the evening of September 27, 1967; the photo spread was made on October 2—or five days later.[4]

Viewed in a light most favorable to the relator, there can be some measure of doubt only as to criterion 1. But Mrs. Talucci's own testimony, *supra*, indicates the overwhelming conviction she had as to the man's identity, and also the lack of persuasive influences on her judgment.[5]

The photo spread was not inherently suggestive and will be left undisturbed.[6]

4. Possibly six days if the time is computed by the dates given in the trial transcript, as noted above, p. 1159.

5. *Cf.* Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

6. Relator argues that *Zeiler* I is followed in Pennsylvania courts, citing Commonwealth v. Whiting, 439 Pa. 205, 266 A.2d 738, cert. denied, 400 U.S. 919, 91 S.Ct. 173, 27 L.Ed.2d 159 (1970). While *Whiting*

b. *The "lineup".*

On October 4, 1967, two days after the photo spread, Mrs. Talucci was taken to West Chester State College by the State Police. The purpose of the trip was to allow Mrs. Talucci to get a whole live view of the relator, as she had requested after identifying his picture. The police made arrangements with the college officials to have petitioner work in a certain area along with various other men and to have Mrs. Talucci placed in a room inside a nearby building. The following events, culled from the original trial transcript (T.T.) took place:

Trooper McDevitt (on cross examination).

A . . . and on this morning there were a group of maintenance men working, sweeping up stone and debris, and we asked her to look out the window and if she sees the man who attacked her to tell us.

\* \* \* \* \* \*

Q Did you direct her attention to the group of workmen there?

A Yes, we did.

Q And how many were in that group?

A Approximately six or seven, I believe.

\* \* \* \* \* \*

Q Did you ever at any time ask her to look at any other group of men of which this defendant was not a member?

A No, sir.

\* \* \* \* \* \*

Q The only group of men out there were the six men working?

A There were students out there.

Q How many?

A I don't remember.

Q It was basically a group of six people that she looked at, of which this man was one?

A Yes, sir.

(T.T. 156–158).

Geraldine Talucci (on direct examination).

A . . . Trooper McDevitt came to me and he showed me this picture [one of several pictures discussed above] and I said this was the man, but that this was a serious, charge, and before I—I wanted to be positively sure, and I asked if I could see the man in person, so he said he would pick me up the next day and take me where this fellow worked at.

So they came about ten-thirty in the morning to my mother's and they picked me up and they drove to West Chester, to the West Chester State Teachers' College, and they took, me in through a side door, and I went to this little office downstairs, and they told me to look out the window and see if I saw the man who had jumped in my car that night.

So I looked out the window for a few minutes and I couldn't see him. There were a group of, maybe five or six men out there. And then I saw him walk past the window, and I told Trooper McDevitt that was him when he walked past the window, and I looked at him for a few more minutes, and I said yes, that definitely was him.

(T.T. 46).

Trooper Bonk (on direct examination).

A . . .

At this time she did look out, and about four or five minutes later she did identify the defendant, Timothy Clemmer, as the person that had committed this crime.

Q Would you describe the group of people outside of which the defendant

controls in state court, in federal habeas cases it is not binding. Pennsylvania state courts are, of course, free to follow more rigid guidelines than those imposed by the federal Constitution, but the federal courts safeguard only the rights secured by the Constitution and once its demands have been met, our inquiry is at an end. *Cf.* Lego v. Twomey, 404 U.S. 477, 478, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

was a member, can you do that for us?

A This group of people, they were out there raking stones and what have you and cleaning up the courtyard, and there were other students walking by, and at a particular time when this defendant had gone by the window, she drew back, and she said that is the man.

(T.T. 172).

■ It is clear from both the trial and the hearing that this lineup took place at the behest of the complainant; it was done to enable her to make sure in her own mind that she had identified the correct man from the photo spread. Since the lineup occurred before the relator was arrested, this case is governed by Kirby v. Illinois, 406 U.S. 682, 92 S. Ct. 1877, 32 L.Ed.2d 411 (1972), which held that a station house show up, before formal charges have been filed, is not a "critical stage" of the proceedings entitling the accused to the assistance of counsel. The Court did go on to note that a lineup, or show up, before formal charges are filed, can be improperly suggestive and so violate due process. At 690–691, 92 S.Ct. 1877. Such cases are governed by Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), which applied a "totality of the circumstances" test. Applying that test to the present case, it appears that the lineup utilized was not suggestive.

After Mrs. Talucci had identified relator's picture, in a photo spread found to be free from suggestive influences, the lineup served merely to confirm her identification of the suspect. Even if the other six individuals in the lineup were not comparable to Clemmer in description, which fact is not established by the record, any error flowing from this would have to be held harmless in light of the witness' prior photo identi-

fication. Perhaps this resolution seems somewhat like a bootstrapping operation, but the purpose of the lineup was to provide the witness an opportunity to identify the man she saw in the photograph, and since it is not denied that the photograph depicted Clemmer, the police seem to have been abundantly cautious in assuring that no prejudicial influences pervaded the lineup. The procedure utilized provided more safeguards than constitutionally required under the Kirby and Stovall line of cases, supra.

## II. Incompetency of Counsel.

■ Given the resolution of the photo spread and lineup questions, supra, the charges of ineffective assistance of counsel going to these two aspects of the case can be dispensed with. While relator was entitled to competent and effective counsel, he was not entitled to, nor could he expect, counsel to argue for and fashion a new "constitutional" remedy not previously, nor even now, available. The failure of defense counsel to move for the suppression of the identification, viewed in this light, appears eminently reasonable and understandable. If counsel had completely failed to even understand the underlying claim, which relator now makes, at the time of trial, it matters not, since the claim had no merit.

■ The other allegations of ineffective or incompetent assistance of counsel are equally without merit. Trial defense counsel testified in this proceeding. I have carefully reviewed trial counsel's testimony and, taken together with the trial transcript, it is evident that every action and inaction on his part about which relator now complains, was based on sound, reasonable and responsible trial defense strategy with complete fidelity to the interests of the client.[7]

7. Defense counsel has, and had, extensive criminal trial experience. He was an assistant district attorney for four years, and district attorney for an additional four years. He has defended approximately 200 crim-

inal defendants, including about 50 cases which actually have gone to trial. (N.T. 127). Additionally, it should be noted that counsel was retained by the relator's family and was not court appointed. (N.T. 128).

1. The "missing witness". Trial counsel, faced with the likelihood that a key defense witness would be unavailable, had taken his deposition, which deposition was read to the jury in its entirety. (T.T. 307–325). Defense counsel concluded the deposition would be more effective than having the witness testify in person.

2. Time sequence. The discrepancies which relator now makes so much of as far as the time frame of Mrs. Talucci's story was concerned did not escape trial counsel's notice. As he explained it, however, he was unwilling to cross examine on this point solely because to do so would have, in his opinion, reinforced the complainant's credibility in the eyes of the jury and re-emphasized the atrocity of the crime. (N.T. 138–141).

3. The "confession". The statement made by relator, when he was taken by the state police before the district justice, to the effect that "I am the man. I did it and they got me." (T.T. 190) surprised the prosecution as well as the defense (T.T. 187). Defense counsel objected strenuously and specifically objected that relator had not been advised of his rights before making the alleged statement (T.T. 187–188). The objection was overruled, and the defendant-relator explained the remark himself on direct examination (T.T. 213). In any event, relator's rights had been previously explained. (T.T. 192–193).

The other allegations raised by the relator as to counsel's incompetency lack substantial merit.

██ On the whole it is apparent that relator had a fair trial, was ably represented by counsel of his own choice and was convicted on the basis of positive, uncontradicted and never-changing identification by the victim. The function of habeas corpus review is not to re-try the case, but merely to review the previous trial to insure that justice has been done. On the basis of the record, and the proceedings in this court, it appears that justice has been served.

The petition will be denied. There is no probable cause for appeal.