Terry C. BUCHANAN, Appellant,

v.

STATE of Alaska, Appellee.

No. 2553.

Supreme Court of Alaska.

March 14, 1977.

9. AS 09.05.015(a)(4)(B).

John W. Hagey and Stephen R. Cline, Asst. Public Defender, Fairbanks, Brian C. Shortell, Public Defender, Anchorage, for appellant.

Harry L. Davis, Dist. Atty., Fairbanks, David Mannheimer, Fairbanks, Ivan Lawner, Asst. Dist. Attys., Anchorage, Daniel W. Hickey, Chief Pros., and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

OPINION ON REHEARING

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

RABINOWITZ, Justice.

Appellee State of Alaska has petitioned this court for reconsideration of one issue with respect to our prior opinion issued on September 27, 1976. We have determined to grant the petition in order to correct our initial opinion.

The primary basis for the State's petition is that "This court's strongly-worded 'disapproval of the prosecutor's conduct in failing to fulfill his agreement regarding the in-court lineup' . . . is unwarranted, unfair and simply not supported by the record."

In response to the Petition an order was entered remanding the matter to Judge William H. Sanders for the purpose of conducting an evidentiary hearing to ascertain whether or not any agreement existed as to the in-court lineup.[1] Thereafter, Judge Sanders conducted an evidentiary hearing and entered Findings of Fact, the most significant of which are the following:

> I find that Mr. Davis did not at any time attempt to mislead or deceive the court, the jury, the defendant or the defendant's attorney in this case on the issues involved here.

> I find that Harry Davis in this case did not at any time act unethically with regard to showing the photographic lineup to the minor witness.

In light of our review of the record of the remand hearing and the superior court's Findings of Fact, we have concluded that our initial opinion in this case should be withdrawn. The attached revised opinion, which deletes all references to an alleged breach of agreement by the prosecutor as well as any reference to alleged unethical conduct on the part of the prosecutor, is issued in place of our original opinion in this matter.[2]

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

RABINOWITZ, Justice.

Appellant Terry Buchanan appeals from his conviction and sentence of 5 years' imprisonment for the crime of lewd and lascivious acts toward a child in violation of AS 11.15.134.[1] In his appeal Buchanan has asserted six separate specifications of error pertaining to the trial and also has attacked the sentence imposed as excessive.

A brief review of the facts as developed at trial will be undertaken at this point before addressing seriatim Buchanan's specifications of error. On October 18, 1974, at approximately 7:30–7:45 p.m., Jane Doe,[2] a 9-year-old girl, was sent by her babysitter

---

1. Our order of remand directed that the evidentiary hearing focus on the following subjects:
   a. The last time, prior to the in-court corporeal lineup, that Mr. Harry Davis showed the photographic lineup to Jane Doe;
   b. What Mr. Davis' understanding was of any agreement reached with defense counsel prior to the in-court lineup relating to use of the photographic lineup;
   c. If any agreement was reached as to restrictions upon the use of the photographic lineup prior to the corporeal lineup, the time when such agreement was first reached;
   d. The factual basis for Mr. Patrick Murphy's assertions of prosecutorial misconduct on Mr. Davis' part.

2. We note that in light of the prosecutor's response to Buchanan's motion for mistrial and the manner in which the mistrial motion was briefed on appeal to this court, we think there existed sufficient basis in the record to support

the original text as it applies to prosecutorial misconduct. We leave to a more appropriate occasion, when the matter is presented in an adversary context, the enunciation of guidelines pertaining to the obligations of both prosecution and defense counsel, which are necessary to ensure fairness in lineup identifications.

1. AS 11.15.134(a) provides:
   A person who commits a lewd or lascivious act, including an act constituting another crime, upon or with the body of a child under 16 years of age, intending to arouse, appeal to, or gratify his lust, passions, or sexual desires, or the lust, passions, or sexual desires of the child is punishable by imprisonment for not more than 10 years nor less than one year.

2. Due to her age the young girl was referred to at all times during the trial as Jane Doe.

to a neighborhood grocery market to purchase some diapers. Jane had to traverse approximately four Fairbanks city blocks to reach the store from her home in Birch Park. She testified that on the way to the store an unknown man in a parked car asked her if she was "Dee Dee's sister" and "Would you take a package." The car was green and white, had "sort of rectangled" windows (opera windows) and had a piece of cardboard against its back window which was identified by complainant at trial as a license plate tag.[3] After declaring, "Well, you're not Dee Dee's sister," the man drove off.

After proceeding to the Denali Store and making her purchases, Jane observed the same car heading away from the store and toward Lathrop Street and then saw the car again travelling in the opposite direction down Lathrop. Finally, she sighted the car parked on Lathrop Street. At this time Jane saw the car's occupant ahead of her walking toward Birch Park; then observed him turn around, and walk toward her. The man then took her bag of groceries and walked across the street. She followed him to get her bag back. At this point he told her he had lost his keys and would "give [her] a couple of dollars if [she would] help me find my keys." According to Jane's testimony, the man was wearing black square-frame glasses at the time.

Jane then told the man she would help him after she had brought her groceries home, but as she reached for her bag the man put his hand over her mouth and said, "Hush, or I'll kill you." He then pulled down her pants and underpants after forcing her to the side of a boat parked on the corner of Stewart and Denali Streets, unzipped his own pants, and attempted penetration. The attack ended when a horn sounded and Jane's assailant observed two boys approaching.

Jane's babysitter, Linda Biggers, testified Jane Doe returned to the apartment between 8:30 and 8:45 p.m. and somewhere between 20 and 30 minutes later they left for the hospital. Detective Morrell Lions testified over defense objection that Jane Doe had, three days after the incident, identified a car similar to Terry Buchanan's as the type her assailant had driven. Officer Lions further stated that Jane Doe picked Terry Buchanan out of a six-photograph lineup shown her shortly after the attack had taken place.

Buchanan's defense was that he was not the person Jane Doe identified as the assailant. He called several witnesses whose testimony was to the effect that on the evening in question he left the Jim Thompson Ford Agency, where he was picking up his car, shortly after 8 p.m.,[4] purchased gas on the way home,[5] and arrived home at approximately 8:30 p.m. Shortly after his arrival home Buchanan began watching "Good Times" on television.[6] In the course of his testimony Buchanan testified he was not in the area of Denali Store on the night in question and that he had not seen Jane Doe prior to his courtroom appearances in the case.[7]

---

3. Jane Doe did not identify the cardboard as a license plate tag prior to trial.

4. Ralph Seekins, manager of Jim Thompson Ford, stated that Buchanan left that establishment between 8 p.m. and 8:30 p.m. Melanie Marotta, an employee of Jim Thompson Ford, testified that Buchanan was still there when she left at 8 p.m.

5. No one at the gas station was able to affirmatively declare they recall Buchanan at the station at any particular time. Thus, the only definitive assertion that Buchanan had stopped for gas at that time came from Buchanan himself.

6. Marie Powell, an employee of KTVF, testified that "Good Times" went on the air that evening at 8:42 p.m. Buchanan testified he was fiddling with his tape recorder after returning home, and several people who were watching television asked him to turn it off because "Good Times" was about to come on. Voncile McLeod, who was present at the time, corroborated this. Detective Gary Vogt testified that Buchanan told him that just as he came home "Good Times" was starting.

7. Detective Raymond Smith testified that he drove over the route between (a) Jim Thompson Ford, (b) the scene of the assault, and (c) Buchanan's house. At the speed limit, the trip from (a) to (b) took 7 or 9 minutes, depending

For his first specification of error Buchanan contends that the superior court erred in admitting testimony concerning pre-trial photographic identification of the assailant's vehicle because such testimony was hearsay and the photographic identification procedures employed by the police were "manifestly unfair." Three days after the purported attack had occurred Detective Morrell Lions of the Fairbanks Police Department arranged for Jane Doe to view pictures of automobiles which were collected in a police automobile mug book. Jane Doe had previously described the vehicle as having green color on the bottom with a white stripe; a cardboard square in the rear window; and "sort of rectangled" windows in the back. From this description Detective Lions assumed the cardboard in the rear window was a temporary license plate and that the vehicle was new. Proceeding on this assumption he commenced the vehicle identification procedures by showing Doe pictures of new cars. Photographs of newer vehicles were located at the back of the mug book. Doe identified a 1974 Mercury Cougar as being like the car in question. This car was the first two-tone car with opera windows she saw in the book. She did not look any further in the book, although a Thunderbird several pages further on also had opera windows. The record also reflects that Doe had earlier stated that the car of her assailant looked like that of Willie Toomer, a friend who owned a 1974 Thunderbird.

In light of these facts Buchanan argues that the vehicle identification procedures employed here were manifestly unfair since the police stopped at the first identification picture chosen and because they failed to furnish Jane Doe with any pictures of Thunderbirds. Buchanan further contends that Detective Morrell Lions' testimony as to Jane Doe's identification was hearsay and not, as the superior court held, susceptible to categorization as state-of-mind evidence, an exception to the hearsay rule. The state counters by asserting, as to the unfairness argument, that Detective Lions was not aware at the time he showed Jane the book of her statements regarding Willie Toomer's Thunderbird. Additionally, the prosecution argues that saying a car is like another is not the same as saying it was the same model.

We reject Buchanan's arguments of unfairness as unfounded. These contentions go to the weight of the testimony concerning the automobile photographic identification, not to admissibility. Concerning Buchanan's position that Detective Morrell Lions' testimony was hearsay and thus inadmissible, we have concluded that this contention must also be rejected. Employing a traditional analysis, we are in agreement with the state's contention that Detective Lions' testimony regarding the vehicle identification by Jane Doe was admissible as corroborative of the in-court identification testimony given by Jane Doe of the vehicle after her identification had been attacked. This "attack" occurred during the cross-examination of Doe when Buchanan's attorney propounded several questions concerning her exposure to the vehicle photographic lineup as well as her initial descriptions of the vehicle to the grand jury.[8] It is firmly established that if the credibility of a witness has been attacked on the basis that influence of others has altered her story, supporting evidence in the nature of prior

on the route taken; from (b) to (c) took 8 minutes; from (a) to (c) took 12 minutes. Thus, if the jury believed that Buchanan left Jim Thompson Ford *shortly* after 8 p.m. (*e. g.*, 8:05), he could be where Jane Doe claimed she first espied him by approximately 8:13 p.m. If the jury believed defendant's witnesses' testimony that he was home by 8:30 p.m., this would give him 9 minutes at the scene. If the jury believed Buchanan arrived home at 8:40 p.m., he would have up to 20 minutes to be at the scene. If Buchanan's witnesses at their best are believed, he left Jim Thompson's somewhere around 8:15 p.m., stopped for gas, and arrived home at 8:30 p.m. (a 12-minute drive if he did not stop).

8. Before the grand jury Jane Doe testified that there was no stripe at the bottom of her attacker's vehicle. Prior to her cross-examination Jane Doe had testified that a vehicle having a white stripe around the bottom was the vehicle used by her assailant.

consistent statements may then be introduced.[9] Under this traditional rule we hold that the superior court did not err in permitting Officer Lions' testimony regarding Doe's initial extrajudicial identification of the type of vehicle involved in the incident.

Although we do not decide the question at this time, we also think there is considerable merit in the state's argument that a new exception to the hearsay rule should be recognized. The state contends that witness A may testify as to witness B's extrajudicial identification if the circumstances surrounding the prior identification were not such as to render it unfair or unreliable, and witness B is available for cross-examination.[10] Professor Wigmore supports such a rule [11] as do a large number of courts,[12] both on the basis of the reliability [13] of such evidence and because cross-examination is readily available.[14] If the rationale behind the hearsay rule is that the declarant cannot be cross-examined and cannot be observed by the trier of fact, such rationale is inapplicable when the person actually making the identification is available at trial.[15]

**9.** McCormick, Law of Evidence §§ 49, 251 n. 85 (Cleary ed. 1972); Fed.R.Ev. 801(d)(1).

**10.** Fed.R.Ev. 801(d) reads in part:

Statements which are not hearsay. —A statement is not hearsay if—

(1) *Prior statement by witness.* —The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (C) one of identification of a person made after perceiving him.

*See also* Cal.Evid.Code § 1238 (West 1965).

**11.** *See* 4 J. Wigmore, Evidence in Trials at Common Law § 1130 (Chadbourn rev. 1972), where the author states:

Ordinarily, when a witness is asked to *identify* the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out the accused (or other person), then and there in the courtroom, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him.

The psychology of the situation is practically the same as when recent contrivance is alleged. To corroborate the witness, therefore, it is entirely proper . . . to prove that *at a former time,* when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind, he recognized and declared the present accused to be the person. . . .

This is a simple dictate of common sense, and was never doubted in orthodox practice. That some modern courts are on record for rejecting such evidence is a telling illustration of the power of a technical rule of thumb to paralyze the judicial nerves of natural reasoning. [emphasis in original; footnotes omitted]

*See also* Comment, *The Use of Prior Identification Evidence in Criminal Trials Under the Federal Rules of Evidence,* 66 Journal of Criminal Law & Criminology 240 (1975).

**12.** *See Gallegos v. State,* 157 Colo. 484, 403 P.2d 864 (1965); *Preston v. Commonwealth,* 406 S.W.2d 398 (Ky.1966); *Johnson v. State,* 237 Md. 283, 206 A.2d 138 (1965); *Taylor v. State,* 298 A.2d 332 (Del.1972); *Willis v. State,* 217 So.2d 106 (Fla.1968); *People v. Poole,* 121 Ill.App.2d 233, 257 N.E.2d 583 (1970); *State v. Matlack,* 49 N.J. 491, 231 A.2d 369 (1967); *State v. Lancaster,* 25 Ohio St.2d 83, 267 N.E.2d 291 (1971).

**13.** *E. g. State v. Taylor,* 99 Ariz. 151, 407 P.2d 106 (1965); *State v. Wilson,* 38 Wash.2d 593, 231 P.2d 288 (1951); 4 J. Wigmore on Evidence § 1130 (Chadbourn rev. 1972); *see generally* Annot., 71 A.L.R.2d 449 (1960).

**14.** *E. g., People v. Gould,* 54 Cal.2d 621, 7 Cal.Rptr. 273, 354 P.2d 865 (1960); E. M. Morgan, *Hearsay Dangers and the Application of the Hearsay Concept,* 62 Harv.L.Rev. 177 (1948); 2 Jones on Evidence § 10.19 (6th ed. 1972). *See* Model Code of Evidence Rule 503(b); Uniform Rule of Ev. 63(1); McCormick, Law of Evidence § 251 (Cleary ed. 1972).

**15.** Cases holding *contra* include *Williams v. United States,* 119 U.S.App.D.C. 190, 338 F.2d 530 (1964); *State v. Degraffenreid,* 477 S.W.2d 57 (Mo.1972). The committee comments to proposed Fed.R.Ev. 801(d)(1)(c) note that in *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the United States Supreme Court, when the issue involved out-of-court identification of the accused, "[s]ignificantly . . . refrained from placing its decision on the ground that testimony as to the making of a prior out-of-court identification . . . violated either the hearsay rule or the right of confrontation." Am.Jur.2d, Fed.R.Ev., New Topic Service, App. 6, at 521 (1975). Instead, the court observed that the states are split and the trend is to admit such evidence. 388 U.S. at 272, n. 3, 87 S.Ct. 1951.

Jane Doe's out-of-court identification of the vehicle was not made in circumstances which would render it unfair or unreliable, and since Jane was available for cross-examination, Officer Lions' testimony was arguably admissible under the new exception to the hearsay rule that the state has advanced in this appeal.

Buchanan, in his next specification of error, asserts that the superior court erred in admitting any testimony as to Jane Doe's pre-trial photographic identification of Terry Buchanan because the identification procedure violated due process as guaranteed by the United States and Alaska Constitutions. More particularly, Buchanan argues that the photographic lineup was so suggestive and prejudicial as to amount to a denial of due process.

■ A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police. *Cf. Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199, 1206 (1967). There the victim was in a hospital and the accused brought to bedside for identification. The Supreme Court held that the questioned procedure was justified by necessity. In *Simmons v. United States,* 390 U.S. 377, 382, 88 S.Ct. 967, 19 L.Ed.2d 1247, 1252 (1968), six photos of robbery suspects were shown to each witness one day after the crime. The Supreme Court held that the photographic identification procedures were not so impermissibly suggestive as to give rise to substantial likelihood of misidentification and thus to violate due process.

■ Buchanan argues that the admonition given Doe at the first photo lineup to ". . . . see if you can find the person that attacked you" suggests too much for a 9-year-old. It is contended that as a result of such a statement Jane Doe would be given the impression that the photographic

lineup contained a picture of the assailant. In addition, only two, the state argues three, of the people whose photographs were shown had light complexions. As to the first argument, whether or not the officer's statement was by itself impermissibly suggestive was properly for the jury to determine, unless so clearly impermissible as to be constitutionally defective.[16] The Supreme Court of the United States had held that when the photographic or other identification procedure is alleged to be prejudicial, the court must inquire into each case on an ad hoc basis to determine if the totality of the circumstances made the procedure prejudicial. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247, 1253 (1968).

As to the number of photos resembling the actual description of the defendant, Buchanan cites two cases supporting his argument. In *United States v. Fernandez,* 456 F.2d 638 (2d Cir. 1972), surveillance photographs revealed the criminal to be extremely light-skinned with an afro haircut. The Second Circuit held that a photographic lineup, where defendant was the only light-skinned Black with an afro, was impermissibly suggestive and violated due process despite the fact that an earlier photo lineup contained photographs of another light-skinned Black with an afro who was not identified by witnesses as the criminal. In *United States v. Clark,* 499 F.2d 889 (6th Cir. 1974), defendant argued that an in-court identification resting on a constitutionally impermissible photographic lineup was reversible error. The eyewitness in *Clark* was shown a series of photos after the robbery. She had described the robber in some detail, including in her description long hair and a drooping moustache. Defendant's picture was the only non-mug shot shown her and the defendant was the only person shown her with long hair and a

**16.** Whether an identification procedure is so suggestive as to deny due process is a question for the judge. *Cf. Stovall v. Denno,* 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206; Annot., 39 A.L.R.3d 1000 (1971). If the directions objected to here were given to an adult, there is

clear support for the position that it would not be so suggestive as to deny due process. *State v. Fullen,* 1 Ariz.App. 466, 404 P.2d 732, 736 (1965); *People v. Vessell,* 275 Cal.App.2d 1012, 80 Cal.Rptr. 617 (1969).

drooping moustache. The court held the procedure suggestive, after independently reviewing the photographs and comparing them with the witness' earlier description, but held the constitutional error to be vitiated by a lineup identification a month later where the witness definitely picked out defendant on the basis of a speech impediment.

■ Our examination of the record, particularly the pictures employed in the photographic display, leads us to the conclusion that the photographic lineup was not so suggestive as to create "a very substantial likelihood of irreparable misidentification." [17] As many as three of the six photographs used in the lineup match the victim's description of a light-skinned Black with short hair. Thus, the instant facts are distinguishable from *Clark* and *Fernandez* where only the defendant's picture in the lineup grouping matched the available description.[18]

■ Appellant's third specification of error is that the superior court erred in failing to grant a mistrial because of prosecutorial misconduct which occurred in connection with a corporeal lineup identification which was conducted during the trial. The record shows that during the trial arrangements were made for an in-court lineup identification to be held. After considerable debate, it was agreed that the victim was, in the presence of the jury, to face away from six men, each of whom would then recite a predetermined sentence. Jane Doe was then to attempt to identify her assailant by voice.[19] After this procedure was completed, Doe was to face the six men and determine if she could pick out her assailant by sight. Jane Doe quickly identified Buchanan by sight.

Buchanan's most significant objection to these in-court lineup procedures centers on the fact that on the day of the in-court identification, Jane Doe was shown, by the state's trial counsel, the six photographs she had been initially asked to view.[20] The state counters by arguing that this pretrial identification procedure goes to weight rather than admissibility of the in-court identification because there is no testimony which indicates that the witness was "coached," and since the jury was aware, as a result of subsequent cross-examination of Jane Doe, of the pre-lineup photo display. In the state's view the most probative identification made by Doe of Buchanan is the earlier photo identification which was made nearly contemporaneous with the attack. Thus, the question this court must determine is whether the display of lineup photographs to Jane Doe, immediately preceding the agreed upon in-court corporeal lineup, deprived Buchanan of a fair trial.

Since Buchanan's photograph was shown to the victim, as part of the original photographic lineup, on the day of the in-court identification, the burden is on the state to demonstrate this facially suspect procedure was not prejudicial. The state seeks to meet this burden by the arguments summarized previously. Courts which addressed the question have found that if a witness is shown a photographic display, containing defendant's picture, prior to an out-of-court lineup, the display does not prejudice defendant provided defendant's picture had been picked from it earlier in a manner not unconstitutional.[21] Some cases stress the gap in time between the photo lineup and actual lineup,[22] a gap not existing here be-

---

**17.** *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968).

**18.** *Compare* our recent decision in *Noble v. State,* 552 P.2d 142, 145–47 (Alaska 1976).

**19.** Jane Doe was unable to identify her assailant by voice.

**20.** These six photographs comprised the photographic lineup which was initially shown to the witness shortly after the assault took place.

**21.** *See* Annot., 39 A.L.R.3d 487, 508 (1971).

**22.** *E. g. State v. Cuckovich,* 485 S.W.2d 16, 20–21 (Mo.1972).

tween the time of the most recent photograph display and the in-court lineup. But those courts addressing the question where the time gap was short, by focusing on whether the prior photographic identification was tainted, and thus the corporeal lineup potentially being the fruit of an impermissibly suggestive photographic lineup, have held the corporeal lineup identification to be admissible.[23] In contrast to these cases in *Commonwealth v. Ehly,* 457 Pa. 225, 319 A.2d 167 (1974), where prior to the corporeal lineup the witness was told that the defendant who she had earlier picked out from photographic lineups (the witness had learned that the man she had identified was named Douglas Ehly) would be present. The *Ehly* court held that where each man in the lineup was asked his name, admission of the evidence of the lineup identification was held error.[24]

When Buchanan's trial counsel learned of the prosecutor's action here, he moved for a mistrial and dismissal with prejudice. In *Torres v. State,* 519 P.2d 788, 791 (Alaska 1974), allusions in the prosecutor's opening argument to inadmissible evidence was held to justify a mistrial. Here Jane Doe was shown the group of six pictures from which she had months earlier identified Buchanan.[25] In a conference prior to the in-court lineup, the district attorney asserted he wished to have Doe identify the photo lineup pictures prior to the in-court lineup. Buchanan's counsel objected on the grounds that this would make the in-court lineup worthless. The district attorney then offered to delay showing the witness the photos until after the in-court identification.

On cross-examination of Jane Doe, Buchanan's attorney first learned, over the district attorney's objections, that the witness had been shown the photographs that day. Buchanan's counsel then asked for a mistrial:

. . . according to this witness' testimony, prior to coming here yesterday and testifying on the witness stand, after we had discussed and tried to arrange the most impartial line-up possible, Mr. Davis, apparently—according to this witness, showed that witness a photograph of the defendant and just more or less cancelled out all the effort on my part and the apparent effort on the State's part and the effort on the court's part, to get this witness into court to identify, based upon her memory of what the person looked like on the night in question. That's serious enough. To show a witness a photograph of the person she's going to come into court to identify, no reason—absolutely no conceivable reason to do that, outside of the one factor is that Mr. Davis wants to be sure that she picks out the defendant, whose photograph appears number 6, on that exhibit.

Now, that's bad enough, but when you add to it the fact that here you have a 9-year-old girl, that makes it even worse. And to me—and I represent to the court, to me that is State misconduct of the highest nature, and it can't be based upon ignorance. It can only be based upon an attempt to guarantee that witness is going to get up on the stand and pick Mr. Buchanan out of that line-up, which you, I, and at least—apparently Mr. Davis, was trying to make as objective and fair

**23.** *E. g., United States ex rel. Clemmer v. Mazurkiewicz,* 365 F.Supp. 1158 (E.D.Pa.1973), *aff'd without opinion,* 487 F.2d 1396 (3d Cir. 1973), *cert. denied,* 415 U.S. 929, 94 S.Ct. 1440, 39 L.Ed.2d 487 (2-day time gap); *United States v. Sherry,* 318 A.2d 903 (D.C.App.1974) (two and a half hours between crime and photo identification); *People v. Jackson,* 12 Ill.App.3d 789, 299 N.E.2d 142 (1973) (2-hour time gap); *State v. McClain,* 206 Kan. 496, 479 P.2d 907 (1971) (witness testified she made her identification on defendant's appearance at time of robbery). *Compare McCracken v. State,* 521 P.2d 499 (Alaska 1974).

**24.** As the suppression court explained in the *Ehly* case, "she had identified a picture of who it had been told her is Douglas Ehly, and then at the lineup one man says, 'I am Douglas Ehly.' Who would you expect her to pick out? Bugs Bunny?" 319 A.2d at 172.

**25.** The record shows that Jane Doe knew Buchanan's picture was No. 6 in the photographic lineup.

as possible. Now that's State misconduct, and I'd move to dismiss the case on the basis of that alone.

We conclude that the trial prosecutor's conduct here did not mandate that the trial court grant Buchanan's motion for a new trial. Here the jury was fully apprised, through Buchanan's cross-examination of Jane Doe, that the witness had been shown, by the prosecuting attorney, the six photographs which comprised the original photographic lineup the day the in-court lineup was held. Additionally, the record is devoid of any indication that the state's trial attorney coached the witness in any manner at the time he displayed the six photographs to her on the day of the in-court lineup.

▮▮▮ Appellant's fourth specification of error is that the superior court erred in failing to give his requested identification instruction. Essentially, the proposed instruction goes beyond the court's instruction in that it focuses attention on possible inadequacies of a witness' identification, such as the time intervening, the opportunity for the witness to observe in the first instance, and possible external influences on the witness' testimony.[26] The instruction actually given in essence states that the state has the burden of proving accurate identification beyond a reasonable doubt. Whether or not a particular instruction should be given is in the discretion of the trial court.[27] In the circumstances of this case we have concluded that the superior court's failure to give the requested identification instruction was not error. The instruction given by the court embodied correct statements of the controlling law on the subject of identification.[28]

▮▮▮ Appellant next advances the contention that the government's evidence was insufficient, as a matter of law, to support

a verdict of guilty of lewd and lascivious conduct. The standard in determining whether the evidence is sufficient to support a conviction was articulated in *Beck v. State,* 408 P.2d 996, 997 (Alaska 1965), in the following manner:

> In determining the issue raised by such challenge, the evidence and the inferences to be drawn therefrom are to be viewed in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt.[29] (citations omitted)

Appellant concedes that sufficient evidence was offered by the state to support a finding that a crime had been committed. But he argues that the single eyewitness' testimony, that of the victim, was so suspect as not to constitute substantial evidence sufficient to support the jury's conclusion that he committed the crime. Specifically, Buchanan notes that Doe was 9 years old; that her story concerning the car evolved as she interacted with adult investigators, at one time the car had no stripe, then it did; "squarish windows" became "opera windows"; the white cardboard in the rear window became a license plate tag; that Doe's description of her assailant likewise evolved so that a dark waist length jacket became a sweater and light colored green pants, and a moustache appeared; and further, that the time element is uncertain since Buchanan's witnesses placed him at Jim Thompson's Ford after 8 p.m. and at home by 8:30 p.m., a 12-minute drive excluding his stop for gas. If Buchanan's witnesses are to be believed, Buchanan did not have time to detour from his route. The point is that if they were even slightly

---

**26.** Basically the instruction calls attention to the various factors mentioned in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

**27.** Alaska R.Crim.P. 30.

**28.** We note that all of the factors to which the instruction alluded were referred to by Buchanan's counsel in his final argument to the jury.

**29.** *See also Noble v. State,* 552 P.2d 142 (Alaska 1976); *Kvasnikoff v. State,* 521 P.2d 903, 905 (Alaska 1974); *Hughes v. State,* 513 P.2d 1115 (Alaska 1973).

mistaken (e. g., 10 minutes), Buchanan had some 20 minutes to be at the scene.[30]

As to the eyewitness testimony, we think it not as flimsy as appellant would have us believe. Three days after the incident Doe identified a car like that of Buchanan's as driven by her assailant. The next day she identified Buchanan in the photographic lineup. While eyewitness testimony can be untrustworthy,[31] given the relatively early and unequivocal identification of both Buchanan [32] and his vehicle, the discrepancies in Doe's story are not sufficient as a matter of law to take the case from the jury. Flaws in a witness' testimony go to the weight to be accorded the evidence. Additionally, Doe's identification of the same type of car as that driven by Buchanan, in a community where a limited number of such vehicles exist or have been recently sold, coupled with the presence of cardboard in the back window, as in Buchanan's car, is probative evidence bearing on Buchanan's culpability. Thus, we conclude that the evidence in the case at bar was sufficient to warrant Buchanan's conviction of lewd and lascivious conduct.

In his sixth specification of error Buchanan presents the argument that the superior court erred when it failed to require the prosecution to proceed with a scheduled preliminary hearing. The record reveals that on the morning the preliminary hearing was scheduled to be held, Buchanan's counsel and the court were informed by the state that the case was being submitted to the grand jury that day and that the prosecution did not intend to present any evidence at the preliminary hearing. The district court then dismissed the pending charges against Buchanan because of the state's failure to adduce any evidence and ordered Buchanan released. The same day Buchanan was indicted for lewd and lascivious acts toward a child. Buchanan subsequently filed a motion for a preliminary hearing after indictment and alternatively for the taking of depositions pursuant to Criminal Rule 15(a).[33] The superior court denied both aspects of the motion requiring only that certain interrogatories be answered by the state pertaining to time factors involved in the circumstances of the case.

Preliminary examinations are provided for under the provisions of Criminal Rule 5.1.[34] The primary purpose of a pre-

---

**30.** If Buchanan left Jim Thompson Ford at 8:05 p.m. and arrived home at 8:40 p.m. (2 minutes before "Good Times" began), there are 20 minutes (excluding transit time) unaccounted for. It could not take 22 minutes to get gas. Admittedly, the time question is close.

**31.** Cf. McCracken v. State, 521 P.2d 499, 502 (Alaska 1974).

**32.** The lighting at the scene of the crime was good (there was a streetlight nearby) and Doe's assailant did not wear a mask.

In Noble v. State, 552 P.2d 142, 144 (Alaska 1976), we said:

Whether eyewitness testimony alone can support a criminal conviction depends upon the credibility of the prosecuting witness. It is axiomatic that the trier of fact, before whom the witness testifies and is cross-examined, is the proper judge of the credibility of the witness and the weight to be given to his testimony. (footnote omitted)

**33.** In his motion Buchanan indicated he would be willing to accept as an alternative an order permitting him to take the depositions of Jane Doe, Linda Biggers, Officers Lions, Fox and Smith.

**34.** Alaska R.Crim.P. 5.1 provides in part:

Preliminary Examination.

(a) Representation by Counsel. The defendant is entitled to be represented by counsel. If the defendant cannot secure counsel, counsel shall be appointed for him.

(b) Order of Proof—Witnesses Called by the State. The state shall first present the evidence in support of its case. All witnesses called by the state shall be examined in the presence of the defendant and may be cross-examined by him or by his counsel.

(c) Witnesses Called by the Defendant. The defendant may produce and examine witnesses on his own behalf. All witnesses including the defendant should he make himself his own witness, may be cross-examined.

· · ·

(g) Discharge of the Defendant. If from the evidence, it appears that

liminary examination under Alaska's Criminal Rule 5.1 is to permit the court to determine whether there is probable cause to believe that an offense has been committed and that the accused was the perpetrator.[35] In *Martinez v. State*, 423 P.2d 700 (Alaska 1967), we rejected the contention that the accused was entitled to a preliminary examination for the reason that he was indicted prior to the time set for his preliminary hearing.[36] In *Maze v. State*, 425 P.2d 235 (Alaska 1967), we held that the right to a preliminary hearing instead of a grand jury indictment is not mandated by Alaska's constitution.

In light of our previous decisions regarding the subject of preliminary hearings, we conclude that the state was not required to proceed with the scheduled preliminary hearing in the case at bar.[37] Implicit in our holding is that the state is not under an

obligation to present any evidence at a preliminary hearing in the circumstances where an indictment has not as yet been returned.[38] Thus, we conclude that Buchanan had no right to demand that the prosecution present its case at the scheduled preliminary hearing.[39] We note further that Buchanan does not allege that he was specifically prejudiced as a result of the superior court's failure to require the state to present evidence at the preliminary hearing.

One final comment is deemed appropriate at this point. We are of the view that if discovery is to be expanded beyond the provisions presently contained in our Rules of Criminal Procedure,[40] we consider it more appropriate that such change come through amendment of our existing rules of procedure after full study by this court's Standing Advisory Committee on Criminal Rules, the bench and the bar.[41]

---

(1) there is no probable cause to believe that an offense has been committed, or
(2) if there is probable cause to believe that an offense has been committed, but no probable cause to believe that defendant committed the offense, then the judge or magistrate shall dismiss the complaint and discharge the defendant. The discharge of the defendant shall not preclude the state from instituting a subsequent prosecution for the same offense.

**35.** *Martinez v. State*, 423 P.2d 700 (Alaska 1967); 1 C. Wright, Federal Practice and Procedure: Criminal § 80 (1969) (hereinafter cited as Wright). An additional function of the preliminary examination is that it can serve as a vehicle for pretrial discovery. *Martinez v. State*, 423 P.2d 700 (Alaska 1967); Wright, *supra*. In *Martinez*, this court held the discovery potentials of preliminary examinations not to be a principal purpose under our rules. The defendant there argued he was entitled to a preliminary examination even though he was indicted prior to the time set for hearing. This court rejected the argument. Professor Wright, in § 80 of his treatise, notes that a few courts have specifically held that the right to a preliminary hearing is a discovery right. *E. g., Blue v. United States*, 119 U.S.App.D.C. 315, 342 F.2d 894, 901 (1964), *cert. denied*, 380 U.S. 944, 85 S.Ct. 1029, 13 L.Ed.2d 964; *United States ex rel. Wheeler v. Flood*, 269 F.Supp. 194 (E.D.N.Y.1967).

**36.** *Compare Merrill v. State*, 423 P.2d 686 (Alaska 1967). Professor Wright concludes that if a preliminary hearing is delayed beyond the indictment, it need not be held at all.

Wright § 8, at 139. *Compare, e. g., United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973).

**37.** After the prosecution advised the district court that it did not intend to go forward with the scheduled preliminary hearing, the district court then awarded Buchanan's attorney costs and subpoena fees, since the state had not notified him prior to the scheduled preliminary hearing of its decision to take the matter to a grand jury rather than to proceed with the preliminary hearing.

**38.** *Compare United States v. Hinkle*, 307 F.Supp. 117 (D.D.C.1969); *United States ex rel. Wheeler v. Flood*, 269 F.Supp. 194 (E.D.N.Y. 1967).

**39.** The failure to demonstrate probable cause, as the result of the government's decision to present no evidence, should result in dismissal of the state's charges against the accused in the district court.

**40.** *See* Alaska R.Crim.P. 6(m), 15, and 16.

**41.** We note that on March 15, 1976, Alaska's Judicial Council "voted unanimously to endorse the proposition that preliminary examinations be made an integral part of a felony prosecution in Alaska, regardless of previous indictment for the same offense."

Recently in *Coleman v. State*, 553 P.2d 40, 52 n. 39 (Alaska 1976), this court said:

We take this opportunity to express the view that there is evidence that the grand

Buchanan's final point in this appeal concerns the sentence of 5 years' imprisonment which was imposed by the superior court. In *Coleman v. State,* 553 P.2d 40, 53 n. 42 (Alaska 1976), *Spearman v. State,* 543 P.2d 202 (Alaska 1975), and *State v. Lancaster,* 550 P.2d 1257 (Alaska 1976), we stated that crimes involving physical harm to another are generally held to be particularly serious, meriting extended sentences.[42] Review of the entire sentencing proceedings and Buchanan's background as disclosed in the presentence report have led us to conclude that the superior court was not "clearly mistaken" in imposing a sentence of 5 years' imprisonment.[43]

As part of his attack on the sentence he received, Buchanan asserts that the presentence report impermissibly referred to police contacts. The subject of the permissible content of presentence reports was examined in considerable detail in our recent opinion in *Thurlkill v. State,* 551 P.2d 541, 543–45 (Alaska 1976). There we said in part:

> We think it is clear, however, that our previous cases and the recently enacted criminal rule [Criminal Rule 32(c)(2)] evidence a strong policy against the use of police contacts in presentence reports. Therefore, in future cases, whenever a report contains information regarding po-

lice contacts, upon request by the defense, the trial judge at the time of sentencing shall state on the record that he is not relying on that information in imposing the sentence.[44] (footnotes omitted)

Criminal Rule 32(c)(2) provides in part: "No record of arrest or other police contacts shall be included in the report." Mere awareness by a sentencing court of other police contacts will not serve to invalidate an otherwise valid sentence. Nor will actual consideration of such contacts invalidate a sentence if from the record or by witnesses' testimony the judge is aware of the circumstances and outcome concerning such contacts.[45] Here Judge Sanders stated that he would not consider acts not leading to convictions. Buchanan argues, however, that because the sentencing court considered the psychiatric evaluations, which considered prior "contacts" in diagnosing Buchanan as a "moderate" deviant, the sentencing process was tainted.

Buchanan's argument of taint is rejected for two reasons. First, the sentencing court stated that, if anything, the psychiatric reports influenced him to lower the presentence report's recommendation of 10 years' imprisonment because the psychiatric reports diagnosed Buchanan's fixations as to young children and sex as "moderate and

---

> jury indictment process may no longer be fulfilling its intended functions, and recommendations have been made that it should be replaced by the preliminary hearing procedure. In this regard, see Rubinstein, The Grand Jury in Alaska: Tentative Recommendations to the Judicial Council (1975).

42. The prosecution's medical evidence showed, in part, that shortly after the attack occurred Jane Doe was examined and found to have "two lacerations along the vaginal introitus."

43. Judge Sanders' handling of the sentencing process in the case at bar is to be commended. Review of the record reflects the sentencing court's care and depth of analysis.

In determining that a 5-year sentence was appropriate, the superior court found, in part, that Buchanan had a fixation towards children and sex; that he represented a high risk of recidivism and danger to society; and that the instant offense was a particularly serious one.

44. In *Thurlkill* we also stated that "[t]herefore, the proper vehicle for the inclusion of police contacts or arrests in the sentencing process is through sworn testimony at the sentencing hearing and not via the presentence report." *Thurlkill v. State,* 551 P.2d 541, 545 n. 8 (Alaska 1976).

45. Cf. *Whitton v. State,* 533 P.2d 266 (Alaska 1975); *Smith v. State,* 531 P.2d 1273 (Alaska 1975); *Lemon v. State,* 522 P.2d 160 (Alaska 1974); *Griggs v. State,* 494 P.2d 795 (Alaska 1972). In *Whitton* this court held that the trial judge did not err in considering a "rap sheet" when he knew the disposition of the offenses listed.

See also *Evans v. State,* 550 P.2d 830 (Alaska 1976); *Layland v. State,* 549 P.2d 1182 (Alaska 1976); *Griggs v. State,* 494 P.2d 795 (Alaska 1972); *Waters v. State,* 483 P.2d 199 (Alaska 1971).

not severe." Secondly, nothing in our prior decisions prevents the sentencing court from relying on a psychiatric report which considers explained police contacts in reaching a diagnosis. The psychiatric reports themselves both referred to earlier incidents in Buchanan's life. The author of these psychiatric reports asked Buchanan about these incidents and doubtless these incidents and Buchanan's answers played a role in the psychiatrist's formulation of his diagnosis.[46] Thus, we are in agreement with the state's argument that:

> . . . Rule [32(c)(2)] . . . states that the report 'shall contain . . . such information about his characteristics . . . and the circumstances affecting his behavior as may be helpful in imposing sentence or in granting probation or in the correctional treatment of the defendant.' To bar the court from considering Buchanan's prior abnormal sexual experiences would . . . make a mockery of the sentencing process, especially in the case where Buchanan has taken the stand and confirmed the essential elements of the report.[47]

The judgment entered below is Affirmed.

**46.** In *Noble v. State,* 522 P.2d 142, 148 n. 15 (Alaska 1976), we said in part:

We note that a trial judge should certainly be furnished wherever possible with the factual situation involved in a prior conviction. If the facts as set forth in the sentencing report are challenged by the defendant, only those facts which appear of record could be considered by the trial court in the absence of direct eye-witness testimony. *See* Criminal Rule 32(c)(2). *See also Galaktionoff v. State,* 486 P.2d 919, 924 (Alaska 1971); *Hixon v. State,* 508 P.2d 526, 527 n. 1 (Alaska 1973).

**47.** *See generally* J. Coffee, Jr., *The Future of Sentencing Reform: Emerging Legal Issues in The Individualization of Justice,* 73 Mich.L.Rev. 1361 (1975), for an excellent treatment of the subjects of sentencing and presentence reports.