Henry NOBLE, Appellant,

v.

STATE of Alaska, Appellee.

No. 2468.

Supreme Court of Alaska.

July 14, 1976.

Mark E. Ashburn, Asst. Public Defender, Fairbanks and Brian Shortell, Public Defender, Anchorage, for appellant.

David Mannheimer, Asst. Dist. Atty., Harry Davis, Dist. Atty., Fairbanks and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

## OPINION

CONNOR, Justice.

Henry Noble was tried by the superior court without a jury for committing lewd and lascivious acts toward a child.[1] He was convicted of this offense and thereafter sentenced to 10 years imprisonment, the maximum sentence for that crime. On appeal he challenges his conviction and sentence on grounds that:

(1) There was insufficient evidence to support a finding of his guilt beyond a reasonable doubt;

(2) the trial court erred in admitting testimony concerning a pre-trial identification of Noble by the victim in the case because the photo identification procedure did not comport with the due process standards of the United States and Alaska Constitutions; and

(3) the sentence imposed was excessive and based on improper information.

### I.

At trial, the state relied primarily on the testimony of the twelve year old male victim, hereinafter referred to as M. B. M. B. testified that on the afternoon of September 19, 1974, he went to the post office in Fairbanks to apply for a Social Security card. He was approached by a man with long black hair wearing a blue nylon jacket with a fur ruff, blue jeans, a blue print turtleneck shirt, and boots. According to M. B., the man started following him and assisted the boy in locating the appropriate Social Security form. The man then suggested that the youth accompany him to a place where he could get "better help," where he would not "bother anyone."

Although the man was unknown to M. B. at that time, M. B. testified that he left with the stranger because he thought he could trust the man. M. B. stated that he accompanied the man down the street, across a bridge, and into the woods where the man threw him down, saying "Shut up or I'll kill you." According to the youth, his assailant then ordered him to perform various sexual acts, and he complied. M. B. stated that the man made him promise not to tell, offering him money if he would not tell the police. M. B. also stated that the man asked him where they could meet the following day. M. B. testified that his assailant allowed him to leave at this point, and that he ran straight to the fire station where he found his father, who was a fireman. There he recited the details of the incident to his father, and the father and son proceeded to the police station where M. B. told his story to Lieutenant Kiernan of the Fairbanks Police Department.

On September 26, 1974, one week after the reported offense, M. B. and his father met with Lieutenant Kiernan for the purpose of viewing certain photographs to see if M. B. could pick out his assailant from among the individuals portrayed in the photographs. There were six photographs, and each was of a dark haired

1. AS 11.15.134.

man.[2] Upon being presented with the pictures, M. B. quickly selected the photo of the appellant, Henry Noble, and identified him as the assailant. At trial, the court relied substantially on the evidence pertaining to the photographic identification in determining the guilt of the appellant.

## II.

It is appellant's contention that the trial court erred in finding him guilty because, according to appellant, there was insufficient evidence to support a finding of guilt beyond a reasonable doubt. In challenging the sufficiency of the evidence, appellant points out that the eyewitness testimony of M. B. was the basis for his conviction. No physical evidence of the crime was introduced,[3] and no other eyewitness testimony was adduced. Appellant maintains that, taken alone, eyewitness testimony is inherently untrustworthy, and that the testimony of M. B. is especially suspect in light of his young age. We agree that convictions based solely on eyewitness identification can indeed be troublesome, and such cases demand scrupulous consideration of the demeanor and credibility of the state's witness by the trier of fact. However, many convictions of sexual assault are necessarily based on this type of evidence because of the nature of the crime.

Whether eyewitness testimony alone can support a criminal conviction depends upon the credibility of the prosecuting witness. It is axiomatic that the trier of fact, before whom the witness testifies and is cross-examined, is the proper judge of the credibility of the witness and the weight to be given to his testimony.[4] There is no incapacity rule for children in Alaska, and the credibility of M. B. was for the court as trier of fact to evaluate. *McMaster v. State*, 512 P.2d 879, 881–82 & n. 4 (Alaska 1973).

The determination by the trier of fact of the credibility of witnesses, the weight of the evidence, and the guilt of the defendant will not be upset lightly. For a defendant to prevail upon a challenge to the sufficiency of evidence to support his conviction, he must meet the test articulated in *Beck v. State*, 408 P.2d 996, 997 (Alaska 1965):

"In determining the issue raised by such challenge, the evidence and the inferences to be drawn therefrom are to be viewed in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt." (citations omitted)

In reviewing the record in this case, we do not find the evidence so improbable or inadequate as to justify overturning appellant's conviction.

It is true, as appellant points out, that there were inconsistencies in M. B.'s testimony. Under cross-examination, Lieuten-

2. It appears that Noble's picture was introduced into the photographic display because his appearance was known to the police and was thought to coincide with M. B.'s description of his assailant. It was the only photo which was deliberately included in the lineup on the basis of the police suspicion.

3. On the afternoon of the reported incident, a police detective checked M. B.'s clothing and body for semen stains, with negative results. The alleged victim's body did not appear to be bruised or injured. He did not visit a doctor. The detective testified that he took M. B. to the post office area in hopes of sighting the suspect. The attempt was unsuccessful. The detective and M. B. also attempted to visit the site of the alleged incident. An inspection of the area did not reveal any physical evidence of the crime, and it is questionable whether they found the correct location.

4. *McMaster v. State*, 512 P.2d 879, 881 n. 4 (Alaska 1973); *see United States v. Kerr*, 439 F.2d 689, 690–91 (9th Cir.1971); *Davison v. United States*, 368 F.2d 505, 507 (9th Cir. 1966); *State v. Taylor*, 451 P.2d 648, 653 (Ariz.App.1969); *People v. Westek*, 31 Cal.2d 469, 190 P.2d 9, 11 (1948); *People v. Stangler*, 117 P.2d 321, 322–23 (Cal.1941); *State v. Jones*, 204 Kan. 719, 466 P.2d 283, 291 (1970); *Martinez v. State*, 511 P.2d 105, 109 (Wyo.1973).

ant Kiernan revealed that although the boy's account of the incident as reported to the lieutenant on September 19, 1974, was substantially the same as that given by the boy at trial, it did differ with regard to the time at which M. B.'s assailant first threatened the child with force. According to Lieutenant Kiernan's report of September 19, 1974, M. B. stated on that date that his assailant had threatened to kill him as the two exited the post office if M. B. did not follow him. At trial, M. B. testified that he was threatened only after they reached the scene of the crime. We do not believe that inconsistencies of this sort justify the reversal of Noble's conviction. They do not render M. B.'s testimony incredible as a matter of law. They do not destroy the probative value of the testimony, but go instead to the credibility of the witness and the weight to be given his testimony.

Appellant also points out that at the preliminary hearing, conducted eleven days after the photographic lineup, M. B. was unable to identify Noble as his assailant. However, Noble had undergone a "marked change in appearance," in the words of the judge at the preliminary hearing, and M. B. stated that his uncertainty was based on the fact that Noble no longer had long hair. We find that M. B.'s unequivocal identification of Noble at the photographic lineup was sufficient,[5] when we consider the evidence under the test enunciated in *Beck.*[6] Thus M. B.'s later inability to make a clear identification of his assailant, when he may have looked substantially different, does not render the first identification insufficient to connect the defendant with the offense.[7]

We likewise note that Noble's alibi was not so strong that reasonable minds could not believe, beyond a reasonable doubt,

that appellant was guilty of the crime charged. Noble testified on direct examination that the first time he ever saw M. B. was in court, and that on the afternoon of September 19, 1974, the time of the alleged crime, he was hitch-hiking from Fairbanks to Nenana, his home. He stated that he spent only the morning of that day in downtown Fairbanks, and that he had passed the time drinking and playing pool in a bar. No witnesses were offered to corroborate his alibi. On cross-examination, Noble admitted he had been drinking heavily, and that he could not recall the time he left Fairbanks.

Finally, appellant points out that M. B. described his assailant as being dressed in a blue patterned turtleneck shirt. Noble contends that he was not wearing such a shirt in Fairbanks on September 19th. The record reveals that Noble visited the Fairbanks Police Station the evening of September 18, and that at that time he was not wearing a shirt fitting the description given by M. B. At trial Noble testified that he had no other clothes with him in Fairbanks. Viewing this evidence in the light most favorable to the state, we do not find it so persuasive as to mandate reversal of Noble's conviction. Thus the judgment of the trial court is affirmed with regard to the sufficiency of the evidence.

### III.

The appellant's next specification of error concerns the admissibility of evidence pertaining to the photographic identification procedure conducted on September 26, 1974. Noble contends that it was error on the part of the trial judge to admit testimony concerning the pretrial photo lineup, on the ground that the identification procedure violated constitutional stan-

---

5. We disagree with appellant that the lineup was not reliable. Moreover, we do not find that M. B.'s second sighting of the defendant a few days before the photo identification necessarily increased the chance of mistaken identification.

6. M. B. also identified Noble at trial. The trial court, however, did not place much reliance on the in court identification.

7. *Cf. Commonwealth v. Torres*, 327 N.E.2d 871, 873–74 (Mass.1975).

dards of due process. He claims that the lineup was so unnecessarily suggestive and unduly prejudicial as not to comport with due process.

The United States Supreme Court noted in *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), that such a claim must be evaluated in light of the totality of surrounding circumstances. It requires consideration of the necessity of the identification procedure under attack, as well as the chance that it led to misidentification. Thus our inquiry is directed toward the question of whether the photo lineup of September 26, 1974, was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [Noble] was denied due process of law." [8]

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court balanced the needs of a particular photographic identification procedure against the risks incumbent in its use, and concluded that the procedure there used was not "unnecessarily suggestive." The circumstances of that case were as follows. FBI agents had identified the defendant as a suspect in a bank robbery because he was connected with a car similar to that used in the robbery. From a relative of the suspect, the agents had obtained six photos, most of which were group pictures, in which the suspect appeared. From these pictures, five bank employees separately identified the suspect on the day following the robbery. The Court found that the use of the photos was justified because the perpetrators were still at large and it was important that the FBI quickly be able to determine whether their suspicions were legitimate so they could properly deploy their forces. Moreover, there was little risk of misidentification since the witnesses had viewed the suspects for up to five minutes at the time

of the offense, the photographic display was held soon after the crime, each witness examined the picture separately, and the witnesses knew nothing of the progress of the investigation, nor that anyone in the photographs was under suspicion.

We have examined the record in the instant case, including the pictures used in the photographic display of September 26, 1974. In our opinion, the record does not support a finding that the photo display was so suggestive as to create "a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra* at 384, 88 S.Ct. at 971. We are unwilling to accept appellant's contention that the makeup of the photographic display suggested in advance the identity of the person suspected by the police, to wit: Noble. *See People v. Slutts,* 259 Cal.App.2d 886, 66 Cal.Rptr. 862, 865–66 (1968). It is true that of the six men portrayed, Noble had the longest hair and the police knew that the boy had emphasized his assailant's long hair. However, the photos do not depict men so different in appearance that Noble's picture can be said to be truly distinctive among the six.[9] The reliability of the identification procedure could have been increased by the inclusion of more pictures, and we note that generally corporeal identification is more accurate than photographic identification. *See* P. Wall, Eye-Witness Identification in Criminal Cases 83 (1965). Nevertheless, the procedure used was not less than the constitutional minimum. It was conducted while the incident was still fresh in the mind of the young victim, and he had ample opportunity at the time of the crime to observe the features and physiognomy of his assailant. There is no indication in the record that M. B. was told that any of the men in the pictures were under suspicion, or that he was aware of the progress of the investiga-

8. 388 U.S. at 302, 87 S.Ct. at 1972.

9. *See Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) ; *United*

*States v. Fernandez,* 456 F.2d 638, 641–42 (2nd Cir. 1972).

tion when he went to the police station on September 26th. Moreover, the police had good reason to include Henry Noble's picture because M. B.'s description of his assailant closely matched Henry Noble's appearance the day before the crime, when he had voluntarily visited the police station to report the discovery of a dead body. Under the circumstances, a photo lineup was a quick and relatively accurate means of determining whether they were on the right track. Thus we conclude that the trial judge did not err in admitting the evidence of the pretrial identification in question.

## IV.

Finally, Noble challenges his sentence on two grounds. He asserts first that it is excessive in length. Second, he argues that the trial court relied upon improper information in imposing the sentence.

As noted at the beginning of this opinion, the appellant was sentenced to a term of 10 years, the maximum available under the statute.[10] Appellant contends that under the circumstances of this case, the trial court was clearly mistaken in imposing a sentence of that length. In *State v. Chaney*, 477 P.2d 441 (Alaska 1970), we held that a sentence will be modified only when "we are convinced that the sentencing court was clearly mistaken in imposing the sanction it did."[11] In determining whether a sentence is excessive, we must, under our holding in *Chaney*, make an independent examination of the record.[12] Review for excessiveness is conducted "in light of the nature of the crime, the defendant's character, and the need for protecting the public."[13]

We have previously noted that a maximum sentence generally should not be imposed "without some foundation for characterizing a defendant as the worst type of offender" within a legislatively designated class. *Galaktionoff v. State*, 486 P.2d 919, 924 (Alaska 1971). *See Donlun v. State*, 527 P.2d 472, 474–75 (Alaska 1974); *Waters v. State*, 483 P.2d 199, 201 (Alaska 1971). In *State v. Wortham*, 537 P.2d 1117 (Alaska 1975), we described some of the factors this court has relied upon to support such a characterization. They include prior criminal convictions, age, employment history, alcohol addiction, presentence report evaluations, and "behavior which has been considered to demonstrate an antisocial nature or dangerous propensities which pose a clear risk to the public."[14]

Henry Noble is a 22 year old Alaska native. Nearly half his youth was spent in various foster homes and juvenile correctional facilities. He has been unable to secure or maintain steady employment, largely because of his recurring and serious problem with alcohol. We note that Noble's previous infractions of the law occurred while he was under the influence of alcohol. Apparently he began drinking at the age of six. Thus far, Noble has lacked the self-discipline or motivation to stop his excessive drinking. Although Noble was previously ordered to participate in an alcohol rehabilitation program as a condition of probation for a prior offense, he failed to attend the program. Noble's adult record includes convictions for assault with a dangerous weapon, forgery, and joyriding, as well as the conviction which is the subject of the appeal.

In light of the foregoing, we are of the view that according to the criteria enunciated in *Wortham*, the appellant could be found to be the "worst type of of-

---

10. AS 11.15.134(a) provides:
   "A person who commits a lewd or lascivious act, including an act constituting another crime, upon or with the body of a child under 16 years of age, intending to arouse, appeal to, or gratify his lust, passions, or sexual desires, or the lust, passions, or sexual desires of the child is punishable by imprisonment for not more than 10 years nor less than one year."

11. 477 P.2d at 444. (footnote omitted).

12. *Id.*

13. *Id.* at 443.

14. 537 P.2d at 1120.

fender"; we are therefore unwilling to agree with Noble that the trial judge's failure to classify him as a "worst type of offender" before imposing the maximum sentence was a fatal omission.

Noble's past activities clearly indicate he possesses a marked propensity for violence when he consumes excessive amounts of alcohol. Until Noble can control his alcohol addiction, the likelihood of his rehabilitation into a productive member of society is slim. His prior record would indicate that such control will probably only be achieved with a highly disciplined and ordered setting. In this regard, we note that the presentence report supports the imposition of the maximum term of imprisonment.

 At the sentencing hearing, the trial judge states that he imposed a 10 year sentence because of the type of offense and because it was similar in nature to a prior offense committed by Noble in 1973. The judge's reference to a "similar" offense concerns an incident described in the presentence report, which was the subject of Noble's assault with a dangerous weapon conviction. Although the case had originally been filed as a lewd and lascivious charge, it was reduced to assault with a dangerous weapon, to which Noble pled guilty. The facts set out in the presentence report indicate that Noble accosted a young boy and forced him to perform various sexual acts after threatening the boy with a knife.

Appellant contends that the judge's reliance on the similar nature of the 1973 offense was error. However, nothing in the transcript on appeal of the sentencing hearing indicates that Noble or his counsel

attempted or desired in any way to challenge the contents of the report. Thus, we hold that Noble waived his right to contest the report.[15]

Our disposition of Noble's sentence appeal is bolstered by our opinion that the sentencing judge was not clearly mistaken, whether or not the facts of the 1973 case are considered. We note, in affirming Noble's sentence, that the efforts of the Division of Corrections should be directed towards resolving Mr. Noble's problems with alcohol. For only with thoughtful institutional care can Henry Noble hope to overcome his personal history of social deprivation and alcoholism, and thus prepare himself to re-enter society.

AFFIRMED.

---

15. We note that a trial judge should certainly be furnished wherever possible with the factual situation involved in a prior conviction. If the facts as set forth in the sentencing report are challenged by the defendant, only those facts which appear of record could be considered by the trial court in the absence of direct eye-witness testimony. *See* Criminal Rule 32(c)(2). *See also Galaktionoff v. State*, 486 P.2d 919, 924 (Alaska 1971);

*Hixon v. State*, 508 P.2d 526, 527 n. 1 (Alaska 1973).

This appeal also challenges the inclusion in the report of certain hearsay evidence accusing Noble of homosexual conduct not the subject of police action. However, the record on appeal does not indicate that Noble's complaints in this matter were presented to the trial judge. Thus they too were waived.