NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JACK T. ROBERSON III, | ) | |
| | ) | Supreme Court No. S-14672 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-07826 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| RHONDA L. MORRISON, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1494 – April 16, 2014 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Jack T. Roberson III, pro se, Anchorage, Appellant. John C. Pharr, Law Offices of John C. Pharr, P.C., Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

I.       INTRODUCTION

        This appeal concerns the custody arrangement between Jack Roberson and Rhonda Morrison. Jack and Rhonda's relationship ended in April 2010. The former couple's two children lived primarily with Rhonda following the parties' separation. In May 2010 Rhonda filed a complaint for custody seeking sole legal and primary physical custody of the children. Numerous pre-trial motions followed. The superior court granted Rhonda sole legal custody and primary physical custody following a January

_____

        *       Entered under Appellate Rule 214.

2012 trial. Jack filed a post-trial motion to dissolve the parties' mutual no-contact order, which the court denied. Jack appeals this denial, as well as the superior court's final custody order and pre-trial orders.

For the reasons that follow, we conclude that the superior court did not abuse its discretion or err in this case. We affirm the superior court's actions presented for review in all respects.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Rhonda gave birth to the couple's daughter in 2002 and son in 2004. At some point Rhonda began to have concerns about Jack's mental health. In December 2008 Jack presented to the Emergency Room at Providence Alaska Medical Center complaining of an increased heart rate. Rhonda told hospital personnel that Jack had been exhibiting symptoms of delusions and paranoia. The psychiatrist at Providence diagnosed Jack with delusional disorder with psychotic features. When confronted with this information Jack became agitated and security was called to stand by. The hospital sent Jack to the Alaska Psychiatric Institute (API). Jack checked himself out of API against medical advice the following day.

In February 2009 Jack was arrested and incarcerated for 50 days in Utah after telling a TSA guard at the Salt Lake City airport that a tool in his carry-on bag was an explosive. Jack later stated that his comment was a joke that was misinterpreted. Following his incarceration, Jack served two years of federal probation. The federal probation system referred Jack to Christopher Reynolds, a mental health professional in Alaska, to conduct a mental health assessment. Reynolds saw Jack for two additional sessions in August and October 2009. Jack and Rhonda's relationship deteriorated following these events.

## B. Proceedings

On May 28, 2010, Rhonda, through counsel, filed a complaint for custody seeking sole legal and primary physical custody of the children. Jack, also through counsel, filed an answer and counter-claim seeking shared physical and legal custody.

On August 26, 2010, Jack filed a "trial brief for interim custody/visitation hearing."[1] He requested joint interim custody and cited for support AS 25.20.070, which states that "[u]nless it is shown to be detrimental to the welfare of the child considering . . . AS 25.24.150(c) [regarding the best interests of the child], or unless the presumption under AS 25.24.150(g) [regarding domestic violence] is present, the child shall have, to the greatest degree practical, equal access to both parents during the time that the court considers an award of custody." In that same brief, Jack also "assert[ed] the psychotherapist patient privilege under [Alaska] Evidence Rule 504" and requested that the court preclude testimony from Christopher Reynolds, the mental health professional who had treated Jack in 2009.

On August 27, 2010, the court held an interim custody hearing. The court heard testimony from Rhonda, who testified that Jack subjected her to verbal abuse throughout their relationship as well as physical abuse in several instances. She described him as "very" manipulative. She also testified that Jack was minimally involved as a parent, treated the children poorly, and exposed them to violent video games. Further, she testified that Jack had attempted to manipulate the children by discussing with them his relationship with Rhonda and by repeatedly telling them that they should refuse to accept any other man in Rhonda's life. The court also heard testimony from Jack's mother, who testified that she had never observed signs of violent

---

[1] The court had previously granted Rhonda's request for a temporary ex parte protective order against Jack for stalking; she was also granted temporary physical custody of the children.

behavior on the part of Jack toward Rhonda and that Jack had treated the children well during his supervised visits. The court stated that it would not make any changes to the visitation schedule because the evidence was not yet closed.

On September 14, 2010, Jack filed a notice of withdrawal of objection to Christopher Reynolds's testimony and withdrawal of his assertion of the psychotherapist privilege. The following day the parties attended another interim custody hearing. Jack testified that he received treatment from Reynolds and would permit him to testify. Reynolds testified that he had provided a mental health assessment of Jack in April 2009, after Jack was referred to him by federal probation officials, and that he provided psychotherapy to Jack on two occasions afterward. Reynolds testified that in his 2009 assessment he concluded that Jack was experiencing a delusional disorder, but that he was not a danger to himself or others.

On November 4, 2010, at the continued interim custody hearing, the court heard additional testimony from Reynolds, Jack, and Rhonda. At that same hearing, Rhonda asked that the court order an Alaska Civil Rule 35[2] psychological examination of Jack. Jack stated that he had no objection to such an exam. The court granted Rhonda's Civil Rule 35 motion for a psychological evaluation of Jack in order to obtain a more current evaluation of Jack's mental health. The court also orally entered an

---

[2]     Subsection (a) of Civil Rule 35 provides:

When the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

interim order, granting Rhonda interim primary physical custody and Jack unsupervised visitation. The court found that there were "a lot of" things in Jack's history that would make a parent feel uncomfortable. However, the court also found that there was no evidence that Jack was a danger to others. Ultimately, the court determined that it would be in the best interest of the children to remain with Rhonda, particularly in light of the stability that she provided them during the school year, which was currently in session. The court granted Jack unsupervised visitation every other weekend, stating that it was giving Jack the benefit of the doubt despite the court's concerns. The court later issued a written interim custody order on December 7, 2010, consistent with these oral rulings.

In December 2010 and January 2011 the parties filed motions concerning the scheduling, scope of, and payment for the Civil Rule 35 examination of Jack. The court ultimately ordered that the scope of the report should include conclusions concerning whether Jack's mental condition had any effect on his ability to parent the children.

In May 2011 Dr. Alfred Collins filed a report of his Civil Rule 35 psychological examination of Jack. He concluded that Jack probably suffered from attention deficit hyperactivity disorder (ADHD), which "explains his impulse control problems," but found that condition did not in itself preclude Jack from being a successful parent. Dr. Collins determined that it was more likely that Jack's "acute breakdowns of past years were isolated, situationally-related events." Dr. Collins further concluded that Jack "has good empathy for his children and appears to understand them well." However, Dr. Collins also noted that Jack's "impulsiveness extends to the emotional sphere and he has trouble keeping his feelings under control," particularly when under stress. Dr. Collins determined that Jack's "track record is not good" in keeping his feelings under control, "as shown by his remarks about the children's mother made in his children's presence." Because Jack's "level of anger towards [Rhonda was]

so high," Dr. Collins recommended individual counseling for Jack, "specifically aimed at helping him control his emotions towards [Rhonda] when working with his children." He recommended that Jack and Rhonda enter co-parenting therapy, but only after Jack completed three months of individual counseling. Finally, Dr. Collins concluded that if Jack and Rhonda "can learn to work together, it might be possible for [Jack] to share parenting in a more equal way."

In late June 2011 the court custody investigator filed her report discussing each of the factors under AS 25.24.150(c) addressing the best interests of the children. With respect to the children's needs, the custody investigator found that Rhonda "meets [the children's] needs well," whereas Jack was preoccupied with "either reconciling with [Rhonda] or hurting her somehow in the custody dispute," such that his focus "has not appeared to be primarily on the children." Overall, the investigator found that Rhonda "is better able to meet the children's needs." On the issue of the children's preference, the investigator found that the children "are too young to understand all the dynamics between the parents." With respect to the willingness and ability of each party to cooperate with the other, the investigator found that Jack would likely not be able to work with Rhonda "as a cooperative co-parent, focused primarily on the children." In particular, the investigator found that Jack inappropriately talked to the children about his relationship with Rhonda and that this "expose[d] the children to issues and information they should be protected from." The investigator also found that "power and control issues between the parents [were] significant." The investigator recommended that the court award sole legal and primary physical custody of the children to Rhonda and that Jack have time with the children on alternating weekends.

In late July 2011 Jack's counsel filed a motion to withdraw for cause — due to an irretrievable breakdown in the attorney-client relationship — as well as a request for a continuance. The motion stated that Jack would be willing to stipulate to adopt the

custody investigator's recommendations on an interim basis. The court issued another interim order adopting the recommendations of the custody investigator and granting the continuance. The court initially denied the motion by Jack's counsel to withdraw, but later granted it at a scheduling conference on August 1. Following the withdrawal of his attorney, Jack proceeded pro se.

In September and October 2011, Jack filed a number of motions.[3] One such motion requested that "[the] children get a mental health evaluation" because "their mental health has been neglected, and at the same time the court can find out the truth about [Rhonda's] false abuse all[e]gations and several other issues." On October 19, 2011, the court held a scheduling conference at which it addressed and denied a number of Jack's motions.

On October 31, 2011, Rhonda filed a motion and affidavit in opposition to Jack's motion requesting that the children undergo psychological testing. She argued that Jack had failed to make a sufficient showing under Civil Rule 35 and *Dingeman v. Dingeman*[4] that mental health evaluations of the children were appropriate.[5] Further, Rhonda argued that the children were happy and healthy and did not show any signs of mental instability, and she "oppose[d] subjecting [her] children to unnecessary testing which may cause them more strife." The court ultimately denied Jack's motion.

---

[3] Jack requested that the court order Rhonda to return some property to Jack, and requested an evidentiary hearing on Dr. Collins's May 2011 report.

[4] 865 P.2d 94 (Alaska 1993).

[5] Civil Rule 35(a) can also apply "[w]hen the mental . . . condition . . . of a person in the custody or under the legal control of a party, is in controversy."

## 2.     The custody trial

The custody trial began on January 5, 2012. On the first day, the court denied a suppression motion brought by Jack "[p]ertaining to [the] Utah [mental health] [e]valuation and [e]verything after," specifically, information Christopher Reynolds referred to in the September 24, 2010 interim custody hearing and Jack's medical records. Rhonda argued that she wanted the order recommended by the custody investigator to remain in place. Jack argued that he wanted shared legal and physical custody. The court heard testimony from four witnesses who appeared on behalf of Rhonda. The custody investigator also testified.

Dr. Collins, the psychologist who conducted the Civil Rule 35 evaluation of Jack, appeared on behalf of Jack. During Dr. Collins's testimony, the court asked Dr. Collins if he believed the children were "of an age where they [were] sufficient[ly] matur[e] . . . to render an opinion that should be given weight in a custody situation," and Dr. Collins replied "No." In response to a question by Jack concerning Dr. Collins's recommendation that Jack attend individual therapy before attending co-parenting therapy with Rhonda, Dr. Collins stated:

> I think you're [Jack] not very aware of your part in this. I don't see you taking responsibility or having a good amount of insight into the things that actually are wrong with you that you need to work on. And . . . that would be the goal of the individual therapy . . . . I think you need to improve your ability to be available to that co-parenting therapy. If you're blaming the other person for everything it's not likely to work.

On the second day of trial, the court heard testimony from Rhonda, Jack, and Jack's mother. Following closing arguments from both parties, the court made its findings. First, the court found Rhonda "generally to be a credible witness," whereas the court had "a very difficult time accepting a lot of what [Jack] . . . said." Second, relying

particularly on the reports and testimony of the custody investigator and Dr. Collins, the court found that Jack exhibited a "consistent pattern" of displaying an "inability to accept what other people have to say" and an inability to accept that he "might have to do something different" from what he is currently doing. Similarly, the court found that Jack had shown he was "unlikely" to accept responsibility for his actions and that he had a tendency to blame others, especially Rhonda, for his difficulties.

Regarding the statutory best-interest custodial factors,[6] the court found that "[t]here is little, if anything, that [the court] disagree[d] with [in] the analysis by [the custody investigator]." The court found that Jack continued to attempt to "draw the [children] into this decision making" and kept asking for a mental health assessment for the children despite the court's attempts to explain to Jack that this would be inappropriate. With respect to the ability of each parent to facilitate a relationship with the other, the court found that it did not "hold it against" Rhonda that she had sought a restraining order against Jack. The court explained that during Jack's examination of Rhonda at trial, it was evident that there was significant tension in the relationship. The court also stated that it was apparent from the words that Jack used and the way he addressed Rhonda that he did not "value her very much" and did not "recognize the importance that she ha[d] to the children." By contrast, the court found that Rhonda "[did] recognize . . . that the children . . . need to spend time with their father." The court found that Jack manipulated and controlled Rhonda in their relationship and that this "still taints the relationship" and "is going to have a direct impact" on Jack's ability to co-parent with Rhonda.

The court adopted the custody investigator's recommendations regarding legal custody, granting Rhonda sole legal custody. The court "[did] not find that the two

---

[6]     AS 25.24.150(c).

parents could meaningfully cooperate" in view of Jack's difficulties communicating with Rhonda. The court also adopted the custody investigator's recommendations for physical custody and visitation, granting Rhonda primary physical custody and finding it appropriate to limit Jack's visitation to every other weekend. The court based its custody decision in part on its finding that Rhonda "will be far more attentive in terms of the children meeting their educational needs."

The court addressed Jack and advised him that he would be required to follow Dr. Collins's recommendation and complete three months of individual counseling before he could file a motion to modify the custody order. The court explained that before it would consider ordering any co-parenting counseling with Rhonda, Jack must first complete a 36-week domestic violence intervention program. The court noted that it found "there are no crimes [of domestic violence] that have been committed" but explained that it believed the domestic violence program would be appropriate to assist Jack "in learning to work with and respect" Rhonda. The court stated that if Jack completed these tasks, it would consider a motion that there had been a material change in circumstances possibly justifying a change in physical and legal custody. The court later issued written findings of fact and conclusions of law and a decree of custody drafted by Rhonda's attorney consistent with the court's oral findings.

### 3. The post-trial mutual no-contact order

On January 30, 2012, Jack filed a motion to dissolve a previously-issued mutual no-contact order.[7] He stated that Rhonda had asked Jack to help their son with

---

[7] Rhonda first requested the court to enter a mutual no-contact order in July 2010; Jack did not object to the order after being advised by the court that it required the consent of both parties. In November 2011 Jack requested a modification of the order. Rhonda's attorney drafted a modification using language Jack proposed. In December 2011 Jack consented to the court entering the proposed order.

school, but with the no-contact order in place Jack did not feel comfortable being at the son's school because he might encounter Rhonda there. In the motion Jack also accused Rhonda of making false allegations of abuse and he stated that "I won't be doing a single day of ANYTHING that has to do with [domestic violence] classes or otherwise." Rhonda filed an opposition to Jack's motion, arguing that Jack had voluntarily agreed to the civil no-contact order and that there was no basis to dissolve it. Jack filed a reply in which he argued that a dissolution of the order was in the best interests of the children. The court denied Jack's motion.

Jack appeals, proceeding pro se.

## III. STANDARD OF REVIEW

"The [superior] court has broad discretion in child custody decisions."[8] We will set aside a superior court's resolution of child custody issues "only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[9] An abuse of discretion exists where the superior court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[10] In general, we do not "readily second guess a trial court's custody determination because it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[11]

---

[8] *Chesser-Witmer v. Chesser*, 117 P.3d 711, 715 (Alaska 2005) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

[9] *Id*.

[10] *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998) (quoting *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 143 (Alaska 1991)).

[11] *Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008) (internal
(continued...)

We review for abuse of discretion the superior court's decision to: (1) grant leave to amend pleadings;[12] (2) order a Civil Rule 35 mental health evaluation;[13] and (3) grant a mutual no-contact order.[14] Evidentiary issues, such as questions of admissibility,[15] the weight to be afforded a particular piece of evidence,[16] and witness credibility[17] we likewise review for abuse of discretion. We apply de novo review when assessing whether a court erred in not holding an evidentiary hearing.[18]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion When It Awarded Sole Legal And Primary Physical Custody To Rhonda.

Jack contends that the superior court abused its discretion in awarding Rhonda sole legal and primary physical custody of the children. In particular, Jack argues that he is better able than Rhonda to meet their son's needs. Jack argues that during the time in which Rhonda had custody of the children, their son suffered from poor school performance and emotional problems.

---

[11](...continued) citations and quotation marks omitted).

[12] *Thompson's Estate v. Mercedes-Benz, Inc.*, 514 P.2d 1269, 1271 (Alaska 1973).

[13] *Dingeman v. Dingeman*, 865 P.2d 94, 98 (Alaska 1993).

[14] *Wee v. Eggener*, 225 P.3d 1120, 1126 n.21 (Alaska 2010).

[15] *Dobos v. Ingersoll*, 9 P.3d 1020, 1023 (Alaska 2000).

[16] *Kava v. Am. Honda Motor Co., Inc.*, 48 P.3d 1170, 1176 (Alaska 2002).

[17] *Noble v. State*, 552 P.2d 142, 144 (Alaska 1976).

[18] *Routh v. Andreassen*, 19 P.3d 593, 595 (Alaska 2001).

The superior court must determine custody in accordance with the best interests of the children and must consider the list of statutory factors set forth in AS 25.24.150(c).[19] The superior court "need not make express findings on all statutory

---

[19]     AS 25.24.150(c) provides nine factors to be considered in determining the best interests of the child:

> (1) the physical, emotional, mental, religious, and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference if the child is of sufficient age and capacity to form a preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
>
> (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;
>
> (7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
>
> (8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(continued...)

factors; instead, its findings 'must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[20] "The legislature has expressed a preference for joint legal custody, and a court may award joint custody if it is in the best interests of the child."[21] However, "joint legal custody is only appropriate when the parents can cooperate and communicate in the child's best interest."[22]

The superior court granted Rhonda sole legal custody and primary physical custody of the children after finding that: (1) Rhonda can meet the children's needs and Jack is unable to do so; (2) the children are too young to form a meaningful preference; (3) the children love both parents equally; (4) Rhonda has been meeting the children's needs and should continue to do so; (5) there was a culture of control and manipulation by Jack, who did not value Rhonda as a person and mother, whereas Rhonda recognizes that the children need to spend time with their father; and (6) Jack "is unable to cooperate" with Rhonda and does not have the ability to co-parent with her. The court's findings are amply supported by the record.

With respect to the children's educational needs, the court found that Rhonda "will be far more attentive" than Jack. These findings were supported by the custody investigator's report, which found that Rhonda met the children's needs well and that, according to an interview with the children's school, Rhonda "attend[ed] teacher

---

[19](...continued)
     (9) other factors that the court considers pertinent.

[20]     *Chesser v. Chesser-Witmer*, 178 P.3d 1154, 1158 (Alaska 2008) (quoting *Smith v. Weekley*, 73 P.3d 1219, 1225 (Alaska 2003)).

[21]     *Jaymot v. Skillings-Donat*, 216 P.3d 534, 540 (Alaska 2009) (citing *Farrell v. Farrell*, 819 P.2d 896, 898 n.1 (Alaska 1991)).

[22]     *Id*. at 899.

conferences and follow[ed] through at home." The investigator noted that Jack worked out of town as a carpenter and "ha[d] a less consistent schedule with the children." The investigator believed that Jack was preoccupied with "either reconciling with [Rhonda] or hurting her somehow in the custody dispute," such that his focus "[was] not . . . primarily on the children." Overall, the investigator found that Rhonda "is better able to meet the children's needs" and had provided a stable and satisfactory environment for the children by supporting the children's regular attendance at and participation in school and other activities.

The record likewise supports the court's finding that the children were too young to form a meaningful preference. The investigator found that the children "are too young to understand all the dynamics between the parents," and at trial the court asked Dr. Collins if he believed the children were "of an age where they [were] sufficient[ly] matur[e] . . . to render an opinion that should be given weight in a custody situation," and Dr. Collins replied, "No."

With respect to the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, the court found Jack was unable to cooperate with Rhonda, and thus joint legal custody was inappropriate. Dr. Collins's report, the custody investigator's report, and Dr. Collins's testimony at trial support this finding. Dr. Collins reported that Jack's "level of anger towards [Rhonda was] so high" that he recommended individual counseling for Jack, "specifically aimed at helping him control his emotions towards [Rhonda] when working with his children." Dr. Collins believed that Jack "lack[ed] the ability to work with [Rhonda]," "blam[ed] [Rhonda] for all his troubles," and "ha[d] by all accounts been quite focused on his own needs and oblivious of hers." He observed that Jack appeared to recognize that "the children's needs must take center stage," but concluded Jack "does not clearly see how to cooperate with [Rhonda] in meeting these needs." He determined

that Jack "will need training in how to cooperate" with Rhonda. He recommended that Jack and Rhonda enter co-parenting therapy, but only after Jack completed three months of individual counseling.

The custody investigator similarly found that Jack would not be able to work with Rhonda "as a cooperative co[-]parent, focused primarily on the children." In particular, the investigator found that Jack inappropriately talked to the children about his relationship with Rhonda, and this "expose[d] the children to issues and information they should be protected from." The investigator also found that "power and control issues between the parents are significant."

Finally, even though Dr. Collins appeared on behalf of Jack as Jack's witness at trial, Dr. Collins again reiterated his concerns with Jack's ability to co-parent with Rhonda in a joint custody arrangement. In response to a question by Jack concerning Dr. Collins's recommendation that Jack attend individual therapy, Dr. Collins stated:

> I think you're [Jack] not very aware of your part in this. I don't see you taking responsibility or having a good amount of insight into the things that actually are wrong with you that you need to work on. And . . . that would be the goal of the individual therapy . . . . If you're blaming the other person for everything it's not likely to work.

The superior court's custody order granting Rhonda sole legal custody and primary physical custody of the children was amply supported by this record and was not an abuse of discretion.

B.     **The Superior Court Did Not Abuse Its Discretion When It Denied Jack's Motion For A Mental Health Evaluation For The Children.**

On October 11, 2011, Jack filed a motion requesting that the superior court order mental health evaluations of the children. Jack argues that the court abused its

discretion when it denied his motion requesting that the children be ordered to undergo psychological testing under Civil Rule 35. He argues that his son's behavior, including mentioning suicide to his sister, being "kicked out of daycare," poor school performance, and "unexplained outbursts toward another child," indicate that an evaluation was required. Jack also argues that both children have poor dental health as a result of stress and that this was further evidence of the need for an evaluation.

We review a trial court's ruling on a motion under Civil Rule 35(a) for abuse of discretion.[23] In *Dingeman* we held that "[t]wo pre-requisites must be met before an order may be issued under [Civil Rule 35]: (1) the mental condition be 'in controversy,' and (2) 'good cause' exist for the examination."[24] We explained that these two requirements

> are not met by mere conclusory allegations of the pleadings — nor by mere relevance to the case — but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination.[25]

Further, the "ability of the movant to obtain the desired information by other means is also relevant";[26] the movant must show that the mental condition in controversy "cannot adequately be evidenced without the assistance of expert medical testimony."[27] In other

---

[23]   *See Dingeman v. Dingeman*, 865 P.2d 96, 98 (Alaska 1993).

[24]   *Id.* at 98-99.

[25]   *Id.* at 99 (quoting *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964)).

[26]   *Id.* (quoting *Schlagenhauf*, 379 U.S. at 118).

[27]   *Id.* (quoting *Gasparino v. Murphy*, 352 So. 2d 933, 935 (Fla. Dist. App. 1977)).

words, "[t]he requirement of good cause is not just a formality"; this requirement is in place to "provide some protection for parties subject to the rule."[28]  Such protection is required because "[d]iscovery of this type is of the most personal and private nature."[29]

The superior court did not abuse its discretion when it denied Jack's motion to require the children to submit to a mental health evaluation.  First, the children's mental health was not "in controversy."  Although the children's mental health was arguably relevant to a determination of their needs, mere relevance to the case is not sufficient.  Even if the children's mental health was in controversy, good cause did not exist for an examination, as there was ample evidence at trial regarding the children's needs.  Notably, the court custody investigator did not identify any mental health concerns, nor did she recommend mental health evaluations for the children.  As Rhonda argued in her earlier motion, subjecting the children to psychological testing could cause them distress.  This court's precedent entitles the children to appropriate protection from such distress by requiring good cause for a mental health evaluation.[30]  We therefore will not disturb the superior court's determination on this point.

### C.     The Superior Court Did Not Abuse Its Discretion When It Denied Jack's Motion To Dissolve The No-Contact Order.

On January 30, 2012, Jack filed a motion to dissolve the no-contact order.  The superior court denied this motion.  Jack argues that the court erred in denying his motion to dissolve the order.  He argues that the court stated that Jack could "back out of [the order] when [he] wanted to."  He also argues that dissolution of the order would be in the children's best interests.

---

[28]     *Id.*

[29]     *Id.* (quoting *Gasparino*, 352 So. 2d at 935).

[30]     *See id.*

"We have held that in appropriate circumstances trial courts may issue no-contact orders under their 'inherent equitable powers.' "[31] A civil no-contact order must be supported by "an independent factual basis."[32] We review decisions to grant a mutual no-contact order for abuse of discretion.[33]

In *Cooper v. Cooper*, we held that "an expression of concern by the parties is insufficient to establish an independent basis for the order. A more specific factual basis was required to support [one party's] belief that there will be future acts of harassment or contact by [the other]."[34] In short, "a general acknowledgment of animosity and distrust . . . is insufficient to establish an independent basis for the order."[35]

Here there was an independent factual basis for the mutual no-contact order. Dr. Collins found that Jack had a high degree of impulsive anger towards Rhonda that prevented him from keeping his feelings under control, especially in front of the children. The custody investigator also found that "[t]he power and control issues between the parents are significant" and that Rhonda described "a long history of [Jack] exhibiting controlling behavior." Moreover, Jack had agreed to the no-contact order in December 2011, and the order uses language that Jack himself suggested. When Jack moved to dissolve the order in January 2012, only a few months after he had agreed to the order,

---

[31] *Wee v. Eggener*, 225 P.3d 1120, 1126 n.21 (Alaska 2010) (quoting *Siggelkow v. State*, 731 P.2d 57, 61 (Alaska 1987)).

[32] *Id.* at 1128.

[33] *Id.* at 1126 n.21 (citing *Cooper v. Cooper*, 144 P.3d 451, 454 (Alaska 2006)).

[34] 144 P.3d at 459.

[35] *Id.*

he provided only minimal argument for his position, stating that "[Rhonda] wanted the order in place . . . because if she talks to me she will end up going back to me." Further, Jack's statement in his motion that he "won't be doing a single day of ANYTHING that has to do with [domestic violence] classes or otherwise" indicates that, at the time of the motion, he was unwilling to remedy the problems the court had identified in Jack's treatment of Rhonda — problems that had initially provided the basis for the no-contact order.

The superior court did not abuse its discretion when it denied Jack's motion to dissolve the mutual no-contact order. Jack's anger toward and psychological manipulation of Rhonda, as well as his refusal to remedy the situation to address his impulsiveness and control issues, provided a sufficient independent factual basis to support the denial of Jack's motion.

**D.    The Superior Court Did Not Otherwise Abuse Its Discretion Or Err In This Case.**

Jack argues that the superior court: (1) accorded too much weight to the custody investigator's report; (2) erred by accepting "portions" of Dr. Collins's report and not others; (3) erred when it found Rhonda credible and Jack not credible; (4) should have suppressed Jack's medical records and the testimony of Christopher Reynolds; and (5) should have admitted a text message into evidence. Additionally, Jack argues the superior court erred by not granting Jack's request for an evidentiary hearing on Dr. Collins's report because the report showed Jack "clearly passed the parenting evaluation." None of Jack's arguments have merit.

Decisions concerning the admissibility and weight of evidence and credibility of witnesses fall within the discretion of the trial court.[36] We will not disturb

---

[36]    *E.g.*, *Getchell v. Lodge*, 65 P.3d 50, 53 (Alaska 2003); *Dobos v. Ingersoll*, (continued...)

such discretionary determinations absent a showing on appeal that "error affected the substantial rights of a party."[37] "We use our independent judgment to decide whether it was error not to hold an evidentiary hearing."[38]

The superior court's denials of Jack's motions as they related to the court's ultimate determination on custody are supported by this record and our prior case law.[39]

---

[36](...continued)
9 P.3d 1020, 1023 (Alaska 2000); *Noble v. State*, 552 P.2d 142, 144 (Alaska 1976).

[37]     *Getchell*, 65 P.3d at 53 (quoting *Dobos*, 9 P.3d at 1023) (internal quotation marks omitted).

[38]     *Routh v. Andreassen*, 19 P.3d 593, 595 (Alaska 2001).

[39]     Starting with Jack's assertion that the superior court accorded too much weight to the custody investigator's report, *Chase v. Chase*, 109 P.3d 942, 946 (Alaska 2005), clearly directs that "[a] custody investigator's report is just one of many pieces of evidence that is available to a trial court in the resolution of a custody dispute. As with other types of evidence, it is within the trial court's discretion to give the report the amount of weight the court deems appropriate."

Jack next argues that the superior court accepted "portions" of Dr. Collins's report and not others in violation of Alaska Evidence Rule 106. Jack misunderstands this rule. As 1 WHARTON'S CRIMINAL EVIDENCE § 4:10 (15th ed. 2013) explains, Federal Rule of Evidence 106, upon which the comparable Alaska rule is based, is the common law rule of completeness that affects the timing of the introduction of written or recorded evidence at trial; it is inapplicable to how the trial court analyzes portions of reports over others. *See also Sipary v. State*, 91 P.3d 296, 298-303 (Alaska App. 2004) (discussing Alaska Evidence Rule 106 and its relationship to the common law rule of completeness).

Jack believes the court erred in finding Rhonda credible and Jack not credible. In *Noble*, 552 P.2d at 144, we made clear that the credibility of witnesses is a determination by the trier of fact that this court will not upset absent an extraordinary showing. We do not observe such a showing in this case.

Jack makes a series of privacy claims in his claim of error concerning the superior court's denial of his suppression motions on his medical records and the

(continued...)

Jack fails to demonstrate how the superior court's decisions on the weight and admissibility of proffered evidence was erroneous or would have altered the superior court's exercise of its discretion in this custody matter.

Our independent review of Jack's request for an evidentiary hearing on Dr. Collins's report likewise does not reveal error on the superior court's part. On October 11, 2011, Jack filed a motion requesting that the superior court order an evidentiary hearing on Dr. Collins's May 2011 report in an effort to modify the interim custody order prior to trial; Jack also requested a six-month continuance until trial. The court denied those requests. The court explained to Jack that there had been "a number of interim custody hearings" and that the court was not "going to take any more evidence on an interim basis" because the next evidentiary hearing would be the January custody trial a few months later.

Jack's October 2011 motion requested a hearing to determine interim custody, but the final custody trial was already calendared for January 2012. Jack called

_____

[39](...continued)
testimony of Christopher Reynolds. Jack explicitly waived his privilege with respect to the testimony of Reynolds, as Jack called Reynolds as his own witness at a hearing on September 15, 2010. At the conclusion of this hearing Jack also agreed to sign a release of his medical records. In *Cooper v. District Court*, 133 P.3d 692, 717 (Alaska App. 2006), the court of appeals stated that "the law deems a person to have 'consented' to the disclosure of privileged information if the person, being present and able to object to the disclosure, fails to object." Not only did Jack fail to object, he invited the disclosure of Reynolds's testimony. Jack also affirmatively consented to the release of his medical records.

As to the text message, we cannot discern Jack's argument from his brief. Because Jack fails to make a substantive argument regarding the merits of his text message claim, he has waived the issue under our well-established rule that "issues not argued in opening appellate briefs are waived. This rule applies equally to pro se litigants." *Hymes v. DeRamus*, 222 P.3d 874, 887 (Alaska 2010) (citations omitted).

Dr. Collins at the January 2012 trial. Jack was free to ask Dr. Collins questions, if he wished, about Jack's assertion that Dr. Collins's report demonstrated Jack "clearly passed the parenting evaluation." The superior court's denial of this motion was not erroneous.

**E.    The Superior Court Did Not Abuse Its Discretion When It Denied Jack's Motion On The Return Of His Property.**

At a July 29, 2010 hearing Rhonda produced a list of the personal effects she left in May 2010 when she moved out of the home she shared with Jack and asked the court to order Jack to return her belongings. Jack responded that he was willing to return the items, but he was going to be out of town for work and would not be able to gain access to the items until he returned home. The court ordered Jack to return the items to Rhonda by August 27, and Jack agreed to do so. The court stated that if there were any items on the list that Jack disputed, he should file a notice with the court, Rhonda should file a response, and the court would address the matter at a later hearing. The court also ordered both parties not to sell or dispose of any belongings from the relationship.

Over one year later, in October 2011, Jack filed a motion requesting that the court order Rhonda to return to him several firearms and an Xbox 360 video game console that he claimed belonged to him. Jack also requested that the court order Rhonda to return to their daughter a pink North Face jacket and a laptop computer. In November 2011 Rhonda filed an affidavit stating that she opposed returning the Xbox because "it is [our son's] and our family uses it for games and movies." With respect to the firearms, Rhonda stated that they "were given to my parents to hold because [Jack] was not allowed to have guns while on probation. They are at my parent[s'] cabin, which is only accessible by boat, plane or snowmachine, and cannot be retrieved until the first snowmachine trip."

-23-                                                                                          *1494*

The superior court explained to the parties that "this is not a . . . case where I have property in front of me, this is a custody case." The superior court questioned Jack about "why, after this case has been going on for over a year, why are you now asking . . . for these things?" At a December 2011 hearing, the court explained that in its earlier ruling concerning Rhonda's property, Jack had agreed to return the items, whereas here Rhonda was not agreeing to return the items. The court denied Jack's motion.

Jack argues on appeal that the court abused its discretion in refusing to order Rhonda to return his property. Alaska Civil Rule 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." "[T]he trial judge ha[s] discretion on whether to allow leave to amend and will have his ruling overturned only when there is an abuse of discretion."[40] "[T]he most frequent reason for denying leave to amend is . . . it would be prejudicial to the opposing party."[41] "Th[is] prejudice can result from . . . issues being raised in the amendment [that] are remote from the scope of the original case."[42]

As the superior court recognized, the scope of the original dispute between the parties concerned legal and physical custody. While the superior court could have granted Jack leave to amend his answer and counter-claim seeking shared physical and legal custody to include a property division, Jack raised this issue on the eve of the custody trial. Other than Jack's firearms, which Rhonda did not object to returning to

[40] *Thompson's Estate v. Mercedes-Benz, Inc.*, 514 P.2d 1269, 1271 (Alaska 1973) (footnote omitted).

[41] *Id*. (citing 6 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1487, 428 (1971)).

[42] *Id*. (citation omitted).

Jack, the items Jack sought ostensibly belonged to the couple's children. We conclude the superior court did not abuse its discretion when it implicitly determined that prejudice would result from permitting Jack to belatedly raise the issues of property division — issues remote from the scope of the original custody case — on the eve of trial.

## V.     CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's actions presented for review on appeal in all respects.